**GENERAL ELECTRIC COMPANY,**
Plaintiff-Appellant,

v.

**MV NEDLLOYD, her engines, boilers, Nedlloyd Lijnen B.V. (Nedlloyd Lines), Defendant-Appellees.**

No. 90, Docket 86–7376.

United States Court of Appeals, Second Circuit.

Argued Oct. 8, 1986.
Decided May 6, 1987.

John E. Cone, Jr., New York City (Douglas A. Jacobsen, William R. Connor III, Bigham, Englar, Jones & Houston, of counsel), for plaintiff-appellant.

J. Scot Provan, New York City (Arthur E. Hoffmann, Jr., Kirlin Campbell & Keating, of counsel), for defendant-appellee.

Before LUMBARD, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal presents a unique challenge to an ocean carrier's limitation of liability under its bill of lading. Guiding our analysis are centuries old maritime principles of carriage, derived from the customs of the law merchant, the resilient strands of which were woven into the cloth of the common law where these principles survive today. General Electric (GE) appeals from a judgment entered on May 1, 1986 in the United States District Court for the Southern District of New York (Duffy, J.). That judgment was a disappointing victory for GE because though the district court held Nedlloyd Lijnen B.V. (Nedlloyd) liable for damage to GE's cargo, it limited that liability pursuant to a provision in Nedlloyd's bill of lading. We affirm.

## BACKGROUND

### A. *Historical Overview*

It is helpful to the discussion that follows to put in context the law that limits a

carrier's liability and the opportunity for a shipper like GE to avoid those limitations. The absolute liability of a carrier of goods by sea under 18th century law—save for several exceptions—made it, in effect, an insurer of the cargo's safe transit. *See* G. Gilmore & C. Black, *The Law of Admiralty* § 3–22 at 139–40 (2d ed. 1975). The increasing use of bills of lading during the 19th century occurred, in part, because under these instruments carriers could limit their liability. But such attempts to limit liability were unavailing when loss of cargo arose from a failure of the carrier to use due care since contracts exonerating carriers from liability were held to violate public policy. *First Pennsylvania Bank v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1116 (3d Cir.1984). The obligation to use due care is now imposed by statute, 46 U.S.C. §§ 1303(1) and (2) (1982), so that a carrier cannot by contract exculpate itself from this duty in providing a seaworthy vessel or in handling or shipping cargo.

In 1921 the Hague Rules adopted this view of a carrier's liability. These Rules—as amended by the Brussels Convention of 1924—were adhered to by the United States in 1937. In the previous year Congress had passed the Carriage of Goods by Sea Act (COGSA) ch. 229, 49 Stat. 1207 (codified at 46 U.S.C. §§ 1300–15 (1982)), which adopted the Hague Rules. COGSA allows freedom of contract outside its provisions only if a carrier's liability is increased, not reduced. Gilmore & Black, *supra,* § 3–25 at 145. Consequently, a carrier's liability for cargo damage today has gone from one extreme to the other—from absolute liability to liability predicated only on a showing of fault.

In regulating ocean bills of lading under COGSA, Congress created federal law governing the terms of transport of goods by sea. COGSA restricts a carrier's ability to limit its liability under its bill of lading. Section 1304(5) of that statute establishes a minimum floor of a carrier's liability: $500 "per package ... or ... customary freight unit." From the standpoint of a shipper the $500 also acts as a ceiling for its recovery in the event of damage or loss of its cargo. Unless the shipper declares a high-

er value for its goods, it may not recover an amount greater than $500 per package. As discussed more fully below, common law principles require a carrier to provide a shipper with a fair opportunity to declare a value greater than $500—the so-called "excess value" or "declared value". For this purpose a space is usually provided on the front of a bill of lading for a shipper to use in declaring excess value. Because such a declaration increases a carrier's liability, it is entitled to charge more for its carriage. This additional charge—called an *ad valorem* rate—is the subject of this appeal.

### B. *Facts*

The facts may be stated briefly. In 1983, during the course of building an electric generating plant in Saudi Arabia, GE needed certain equipment to be shipped from America and booked space for its transport with Nedlloyd, an ocean carrier. GE's Manager for Export Ocean Transportation did not inquire about declaring an excess value, nor did Nedlloyd apprise GE that it could declare excess value although the bill of lading contained a box for excess valuation. Had GE declared such excess, it would have been required to pay a 10% charge on the total value of the goods shipped in addition to the customary freight charge. GE states that its cargo had a value of $750,000—thus the 10% *ad valorem* rate would have resulted in a $75,000 charge—in addition to the $9,700 freight charge paid to Nedlloyd. This excess or *ad valorem* charge was contained in a tariff filed by Nedlloyd with the Federal Maritime Commission.

The cargo consisted of 26 items of equipment being shipped from Portsmouth, Virginia to Yenbu, Saudi Arabia. The two damaged items that prompted this suit were loaded on a flatbed trailer equipped with wheels and rolled aboard the M.V. *NEDLLOYD ROUEN.* One of the items was a Generator Auxiliary Compartment cab shipped "as is" and the other was a 10–ton control cab, ten feet long and 18 feet high. On February 16, 1983 Nedlloyd issued a bill of lading, the front of which had the customary space for declaring ex-

cess value. Language in this space referred to a clause on the back of the bill of lading. That clause purported to limit Nedlloyd's liability to L 100 sterling per package or unit of weight. But another clause on the back of the bill of lading—entitled the "U.S.A. Clause"—stated that COGSA governed if the bill of lading "cover[ed] the transportation of goods ... from ports of United States of America." That clause incorporated by reference various provisions of COGSA, including § 1304(5).

The *NEDLLOYD ROUEN* sailed from New York on February 18, 1983 and a day or two later encountered gale winds and stormy winter weather in the North Atlantic. When the *NEDLLOYD ROUEN* began rolling and heaving, GE's two cabs broke free from their lashings, fell onto the deck from the flatbed trailer, and were damaged. Following unsuccessful repair attempts, the damaged equipment was later replaced by two new units.

## C. *Proceedings Below*

A year later GE sued Nedlloyd for one million dollars. Nedlloyd answered and moved for partial summary judgment claiming that COGSA's $500 limitation applied. GE responded that Nedlloyd's *ad valorem* rate was unreasonably high compared to Nedlloyd's cost of obtaining additional insurance sufficient to cover the greater risk to Nedlloyd had GE declared excess value. GE also argued that the bill of lading should have mentioned explicitly COGSA's $500 limitation, rather than merely incorporating it by reference. Finally, GE urged that the print on the back of the bill of lading—where the "U.S.A. Clause" was located—was illegible because it was too small to read.

The district court granted Nedlloyd's motion and summarily rejected GE's latter two contentions. It found that Nedlloyd bill of lading "clearly contained" a space for declaring excess value and provided sufficient notice that COGSA's limitation

applied. It further held that the issue of the print size was irrelevant to the question of whether GE received adequate notice of its right to declare excess value.

The district court also rejected GE's first contention that Nedlloyd's rate was unconscionably high for two reasons. First, it was unconvinced that the *ad valorem* rate prevented GE from declaring excess value. Citing Diplock, *Conventions and Morals— Limitation Clauses in International Maritime Conventions,* 1 Journal of Maritime Law and Commerce, 525, 529–30 (1970) (Diplock), the court stated that if it were actually more economical for carriers rather than shippers to insure the excess value, then *ad valorem* rates would reflect this fact and, as a consequence, be lower than they are. Thus, because Nedlloyd's *ad valorem* rate exceeded what it cost GE to insure its cargo, it was not the *ad valorem* rate but the economics of insuring the cargo that prevented GE from declaring excess value. Judge Duffy additionally found that GE had no intention of declaring an excess value for its cargo. For this finding, the district court relied on GE's Export Ocean Transportation Manager's statement that in 43 years of working in the transportation department he had never known GE to declare excess value.

Following the district court's disposition of its motion, Nedlloyd consented to an entry of judgment against it for $28,500 plus interest.[1] GE appeals challenging the rulings that Nedlloyd's *ad valorem* rate was reasonable and that its bill of lading provided adequate notice of the COGSA limitation. Before discussing these issues, we consider the threshold question of jurisdiction.

## DISCUSSION

### I *The Jurisdictional Issue*

#### A. *Primary Jurisdiction Generally*

Nedlloyd argues that GE's challenge to its *ad valorem* rate essentially involves an

---

1. One of the two items was found by the district court to be a single "package" subject to the $500 limitation. The other was charged on the basis of 40 cubic foot units of which it had 56

units × $500 or $28,000. Appellant takes no issue with this computation of $28,500 if the COGSA limitation applies.

attack on its reasonableness. As such, Nedlloyd continues, under the doctrine of primary jurisdiction the Federal Maritime Commission (FMC) is the proper body to pass on that complaint first.[2]

■ Primary jurisdiction is a doctrine that is used to determine whether a given issue should be passed on first in a judicial or administrative forum. In other words, it fixes priority for passing on a given issue. While administrative expertise is a factor that a court considers in deciding whether it should take initial jurisdiction, *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), the principal reason why such a doctrine exists is to encourage a court and agency to act in coordination with one other. *See* 3 K. Davis, *Administrative Law*, § 19.01 at 5 (1958). Thus, when Congress has entrusted the regulation of certain subject matter under a statute to an administrative agency, it is often counterproductive for a court to act upon that subject matter without the benefit of knowing what the agency has to offer. Beyond that, courts and administrative agencies should not act at cross purposes lest they become "wholly independent and unrelated instrumentalities of justice, each acting ... without regard to the appropriate function of the other." *United States v. Morgan*, 307 U.S. 183, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1121 (1939).

There is no fixed formula for deciding when the doctrine applies. *Western Pacific Railroad*, 352 U.S. at 64, 77 S.Ct. at 165. Analysis is on a case-by-case basis. But courts ordinarily do not defer when the issue involved is purely a legal question, one not involving agency expertise or experience. *Board of Education v. Harris*, 622 F.2d 599, 607 (2d Cir.1979), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). In determining whether to defer, courts should determine "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pacific Railroad*, 352 U.S. at 64, 77 S.Ct. at 165.

## B. *Application of Primary Jurisdiction Doctrine*

Thus, we examine the factors upon which the existence of the doctrine rests to determine whether deferral is appropriate. Before applying these factors, it should be noted that the posture of the instant case distinguishes it from the one upon which Nedlloyd principally relies in urging that the doctrine of primary jurisdiction be applied, *United States Navigation Co. v. Cunard Steamship Co.*, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932). In *Cunard*, the Supreme Court affirmed the dismissal of the petitioner's request for injunctive relief. The Court held that the petitioner's challenge to a group of carriers' freight rates was within the FMC's primary jurisdiction. *See id.* at 481–85, 52 S.Ct. at 249–50. There, petitioner charged that respondent's rates interfered with commerce by operating to "exclude [petitioner] entirely from the carrying trade between the United States and Great Britain." *Id.* at 480, 52 S.Ct. at 248. The FMC is considered to have the expertise to answer this question, as its statutory mandate directs it to examine whether rates are "so unreasonably high or low [as] to be detrimental to the commerce of the United States." 46 U.S.C. § 817(b) *repealed by* The Shipping Act of 1984, Pub.L. No. 98–237, § 20(a), 98 Stat. 67, 88. In contrast, GE challenges Nedlloyd's rates as effectively eliminating its right to declare a higher value for its cargo, a question which, as we shall develop more fully, does not similarly fall within

---

**2.** Nedlloyd's request that the doctrine of primary jurisdiction be invoked is inconsistent with its argument that the judgment appealed from be affirmed, since the district court ruled in Nedlloyd's favor on the reasonableness of the *ad valorem* rate. In fact, the district court's conclusion that the rate was reasonable was central to its holding that GE had been afforded a fair opportunity to declare excess value. If, as Nedlloyd suggests, deference to the FMC is the order of the day, then the court below also should have deferred to that administrative body, and Nedlloyd should be urging not affirmance, but reversal. Nonetheless, for the reasons discussed, we find no basis to reverse.

the bounds of the FMC's area of expertise. Consequently, *Cunard* does not require court deferral of GE's challenge, but it does point up the need to determine the applicability of the doctrine of primary jurisdiction.

One factor already noted is the need for uniformity and consistency in the regulation of business entrusted to a particular agency. *See Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). Since actions challenging an individual carrier's *ad valorem* rates are like rare birds—seldom, if ever, seen—there is little danger that the uniformity or consistency of the regulatory scheme will be set at odds because a court first considers the issue. In fact, neither party has cited a single action challenging an individual carrier's *ad valorem* rates either before the FMC or the federal courts. Nor has research uncovered any. This lack of case law is not surprising in view of the limited power given the FMC by the Shipping Act of 1916. As we observed in another context: "[T]he Shipping Act [of 1916] is a very limited regulatory scheme. It imposes only a few general duties, and the central purpose of the statute was to provide for industry self-regulation...." *Square D. Co. v. Niagara Frontier Tariff Bureau,* 760 F.2d 1347, 1362 (2d Cir.1985), *aff'd,* — U.S. —, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

Moreover, the legislative history of the Shipping Act of 1984 again reflects the limited role that the FMC has played in regulating this particular aspect of the maritime industry. In discussing § 817(b)(5)—the substantive section of the 1916 Act implicated by a challenge to the reasonableness of an *ad valorem* rate—a House Report stated: "[T]he FMC can investigate specific violations of the Shipping Act; however, except for a seldom exercised power to disapprove rates found to be 'so unreasonably high or low as to be detrimental to the commerce of the United States' (46 U.S.C. § 817), the FMC does not

possess authority to set rates in foreign commerce." H.R.Rep. No. 53 (Part II), 98th Cong., 2d Sess. 3 (1983), *reprinted in,* 1984 U.S.Code Cong. & Ad.News 167, 221, 222. The 1916 Act has been further substantially modified by the Shipping Act of 1984, Pub.L. 98–237, 98 Stat. 67, *codified at* 46 U.S.C. App. § 1701 *et seq.* (Supp. III 1985). More specifically, the 1984 Act repealed § 817(b)(5), which is the substantive section of the 1916 Act at issue here. *See* Pub.L. 98–237, § 20, 98 Stat. 88. Thus, the FMC currently lacks authority to regulate *ad valorem* rates in international commerce.[3] As a consequence, the certainty that a court's consideration of the reasonableness of this *ad valorem* rate is not a rude shouldering ahead of the administrative body rests on the total absence of any past administrative law respecting such rates and the unlikelihood of any arising in the future.

A second factor is whether the agency's expertise should first be brought to bear on the matter. *See, e.g., Western Pacific Railroad,* 352 U.S. at 64, 77 S.Ct. at 165. Yet here the FMC's experience is not needed to determine if Nedlloyd's *ad valorem* rate denied GE a fair opportunity to declare value. The administrative agency's specialization would not offer much assistance in resolving that issue because its expertise is directed to a wholly different question: whether the *ad valorem* rate is "so unreasonably high or low as to be detrimental to the commerce of the United States." 46 U.S.C. § 817(b)(5), *repealed by* the Shipping Act of 1984, Pub.L. No. 98–237, § 20(a), 98 Stat. 67, 88. The resolution of that question is clearly best left in the first instance to the administrative agency, which is better equipped to engage in the wide-ranging factual analysis necessary to resolve it. Quite distinct is the instant legal issue, that is, whether Nedlloyd's rate is set so unreasonably high that courts should refuse to give effect to its contractual limitation of liability specified in its bill

---

3. Despite the current inability of the agency to hear this sort of complaint, the primary jurisdiction question still must be resolved because the 1984 Act contains a savings provision that applies to this action. *See* Pub.L. 98–237, § 20(e)(2)(B), 98 Stat. 90, *codified at* 46 U.S.C. App. § 1719(e)(2)(B) (Supp. III 1985).

of lading. *See Adams Express Co. v. Croninger*, 226 U.S. 491, 509, 33 S.Ct. 148, 153, 57 L.Ed. 314 (1913); *Shippers National Freight Claim Council, Inc. v. Interstate Commerce Comm'n*, 712 F.2d 740, 747 (2d Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). As such, the issue involves the application of common law principles, *Adams Express*, 226 U.S. at 509–10, 33 S.Ct. at 153; *First Pennsylvania Bank*, 731 F.2d at 1116, more competently decided in a judicial forum. *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 305, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Board of Education v. Harris*, 622 F.2d at 607.

Finally, courts consider whether Congress has given an agency power to immunize a person or organization from common law liability. *See Nader*, 426 U.S. at 303, 96 S.Ct. at 1986. Here, of course, the relevant basis for liability would be negligence. The Shipping Act of 1916 did not grant the FMC power to immunize carriers from liability for negligence. The only immunization that the FMC could—and still can—confer relates to the antitrust implications of carriers' agreements or actions. *See* 46 U.S.C. § 814 (1982), *amended by* 46 U.S.C. App. § 814 (Supp. III 1985); *Square D.*, 760 F.2d at 1361–62. Because GE has not challenged the *ad valorem* rate as violating antitrust prohibitions, there can be no usurpation of the FMC's functions.

■ Because those factors that bring the doctrine of primary jurisdiction into play are absent, there is no reason to adopt Nedlloyd's suggestion that the issue of the reasonableness of GE's *ad valorem* charge be referred to the FMC.

## II *Fair Opportunity*

■ Next, in order to decide whether Nedlloyd denied GE a fair opportunity to declare value we examine the applicable common law principles. A carrier must provide a shipper with a "fair opportunity" to declare excess value. Only by granting shippers a fair opportunity to choose between paying a greater or lesser charge to obtain corresponding more or less protection for its goods may a carrier limit its liability to an amount less than the loss actually sustained. *See New York, New Haven & Hartford Railroad Co. v. Nothnagle*, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953). Absent fair opportunity, a carrier loses the benefit of any limitation of liability to which it otherwise might be entitled. *See, e.g., Komatsu Ltd. v. States Steamship Co.*, 674 F.2d 806 (9th Cir.1982).

Fair opportunity, as developed in decisional law, comprises several different elements, two of which are present in this case. The first concerns whether the carrier has given adequate notice of the limitation of its liability to the shipper, thereby affording the shipper means of avoiding such limitation. The adequacy of notice in Nedlloyd's bill of lading will be discussed in part III. The means of avoiding the carrier's limitation of liability is, of course, for the shipper to declare the value of its goods. Once a shipper exercises this right, it must then pay an *ad valorem* charge.

■ The second element of the fair opportunity inquiry focuses on the *ad valorem* charge itself. As articulated in the leading case on this subject, a carrier must offer the shipper an *ad valorem* charge that is reasonable. *See Hart v. Pennsylvania Railroad Co.*, 112 U.S. 331, 341–42, 5 S.Ct. 151, 156, 28 L.Ed. 717 (1884). *Hart* teaches that the reasonableness of the *ad valorem* rate is measured by the amount of risk assumed, i.e., the declared value of the goods. *See id.* at 340, 5 S.Ct. at 155. "The principle is that the charge should bear some reasonable relationship to the responsibility, and that the care to be exercised shall be in some degree measured by the bulk, weight, character and value of the property carried." *Adams Express*, 226 U.S. at 510, 33 S.Ct. at 153–54. Because the only factor of those enumerated that is different when a shipper makes a declaration is the value of the cargo, *Adams Express* states that the risk assumed by the carrier is measured by the declared value.

As noted earlier, GE's attempt to avoid COGSA's $500 limitation consists principal-

ly of an attack on the reasonableness of Nedlloyd's *ad valorem* 10% rate on total declared value. Our research disclosed no cases in which an *ad valorem* rate has been indicted as constituting a prohibited means by which a carrier attempted to limit its liability. GE's argument is unique in this respect.

■ Regardless of the novelty of GE's claim, it cannot now challenge the *ad valorem* rate as being unreasonable because the record shows that GE never even inquired about making such a declaration, much less took steps towards actually declaring the value of its cargo. Thus, we conclude that GE is estopped from arguing—after its cargo was damaged—that an excessive *ad valorem* charge prevented it from declaring their value initially. *See First Pennsylvania*, 731 F.2d at 1122. As an experienced shipper, GE obviously knew it could declare a higher value. The lack of evidence with respect to GE's investigation of Nedlloyd's *ad valorem* charge strongly suggests that "[t]hey made a business judgment ... not to explore the possibility of obtaining greater protection ... at [a] higher rate." *Id.* Hence, the alleged excessiveness of Nedlloyd's *ad valorem* charge played no part in denying GE a fair opportunity to declare value. Instead, it was GE's own cost-benefit analysis that prevented it from taking such a step. Moreover, the cost analysis was made long before this particular action was contemplated, as attested to by GE's Export Ocean Transportation Manager's statement that he had never known GE to declare the value of its ocean cargo.

### III  *The Adequacy of Notice*

■ The final issue is whether Nedlloyd's bill of lading provided GE with adequate notice of the $500 limitation and the means of avoiding that limitation. Familiar principles guide this inquiry. The carrier bears the initial burden of proving fair opportunity. *Cincinnati Milacron, Ltd. v. M/V American Legend*, 784 F.2d 1161, 1163 (4th Cir.), *rev'd on other grounds*, 804 F.2d 837 (1986) (en banc). *Prima facie*

evidence of that opportunity is established when it can be gleaned from the language contained in the bill of lading. *Cincinnati Milacron*, 784 F.2d at 1163; *Petition of Isbrandtsen Co.*, 201 F.2d 281, 285 (2d Cir.1953). If the carrier succeeds in demonstrating fair opportunity, the burden of proof shifts to the shipper to demonstrate that a fair opportunity did not in fact exist. *Id.*

■ We agree with the district court that Nedlloyd's bill of lading furnished GE with adequate notice and, hence, fair opportunity. As we held in *Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam*, 759 F.2d 1006, 1017 n. 12 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985), the language on the back of the Nedlloyd document incorporating COGSA's provisions and the space for declaring excess value on the front are sufficient notice of the limitation of liability and the means of avoiding it. GE's attempts to distinguish *Binladen* are unconvincing. The other claims raised on this appeal regarding Nedlloyd's bill of lading are without merit and require no further discussion.

### CONCLUSION

Accordingly, the judgment of the district court is affirmed.