TRAVELERS INDEMNITY COMPANY,
Plaintiff–Appellant,

v.

The VESSEL SAM HOUSTON,
Defendant,

and

Waterman Steamship Corporation,
Defendant–Appellee.

No. 92–55277.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 1994.

Decided June 2, 1994.

Dennis A. Cammarano, Long Beach, CA, for plaintiff-appellant.

William H. Collier, Jr., Dawn M. Schock, Michael L. Armitage, Keesal, Young & Logan, Long Beach, CA, for defendant-appellee.

Before: HUG, WIGGINS, and NOONAN, Circuit Judges.

Opinion by Judge WIGGINS

WIGGINS, Circuit Judge:

This action arose when a barge owned and operated by appellee sank in the inner harbor of Alexandria, Egypt. The barge was carrying machinery and materials for appellant's assured. Appellant sustained a loss of $1,174,876 when a portion of the cargo was lost or damaged. Appellant brought suit against appellee in federal district court. Appellee moved twice for partial summary judgment. The district court found that the $500 per package or per customary freight unit limitation on liability, set forth in the Carriage of Goods by Sea Act (COGSA), controlled. *See* 46 U.S.C. §§ 1300–1315. In addition, the district court found that 77 "packages" were damaged or lost. Thus, the district court granted appellee's motions for partial summary judgment and entered final judgment against appellee for $38,500. Appellant appeals this final judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I.

In December 1989, appellant's assured, L.A. Water Treatment Corporation, delivered machinery and equipment to appellee Waterman Steamship Corporation for carriage from Louisiana to Alexandria, Egypt.

The shipment consisted of steel, valves, pumps and other materials to be used in the erection of sewage treatment plants and elevated water tanks. L.A. Water insured the goods with appellant Travelers Indemnity Company.

Waterman's stevedore loaded the cargo onto LASH ("lighter aboard ship") barges. The LASH barges were then lifted aboard the LASH vessel, M/V Sam Houston. Travelers asserts that the stevedore received most of the cargo with little or no packaging or preparation for transportation. Waterman disputes this assertion. As evidence that the cargo was packaged, Waterman offers the declaration of the stevedore's general manager. He stated that it is the stevedore's policy to load only cargo that has been packaged or, if it is a single unit, prepared for shipment. He further asserted that "every piece [of L.A. Water's cargo] was carried aboard the barge either crafted, skidded, banded, or shrink-wrapped in package form."

Ultimately, the cargo was carried under Bills of Lading # 1, # 4, and # 5. The total shipment consisted of 286[1] packages.[2] LASH Barge No. WA10449 carried 77 of the 286 packages.[3] Waterman and L.A. Water did not use Waterman's standard freight rates, but rather established freight rates through negotiation.

In January 1990, LASH Barge No. WA10449 sank in the inner harbor of Alexandria. All 77 packages on board were lost or damaged. (No damage was caused to any of the cargo carried on the other LASH barges.) Travelers sued Waterman for money damages. Travelers also sued L.A. Water in a separate lawsuit.

Waterman made two motions for partial summary judgment. Waterman asserted that its liability was limited to $500 per pack-

---

**1.**

| Bill of Lading | Number of Packages Carried |
|---|---|
| # 1 | 18 |
| # 4 | 103 |
| # 5 | 165 |
| Total | 286 |

**2.** Note that we use the word "packages" here for convenience. It is precisely the use of this term that the parties dispute.

**3.**

| Bill of Lading | Number of Packages Carried |
|---|---|
| # 1 | 8 |
| # 4 | 21 |
| # 5 | 48 |
| Total | 77 |

age or per customary freight unit. *See* 46 U.S.C. § 1304(5).[4] On August 28, 1991, the district court granted one of Waterman's motions for partial summary judgment. The district court found that there was no genuine issue of material fact as to the cargo shipped under Bill of Lading # 1. Specifically, the district court concluded that Bill of Lading # 1 was subject to COGSA's $500 per package limitation on liability. The district court denied partial summary judgment as to the cargo shipped under Bills of Lading # 4 and # 5, however. It found that, as of that time, a genuine issue of material fact remained.

On January 24, 1992, the district court granted Waterman's second motion for partial summary judgment as to the cargo shipped under Bills of Lading # 4 and # 5. The district court therefore then concluded that the $500 limit on liability applied to all 77 packages which sank. Accordingly, the district court calculated Waterman's liability to be $38,500. Final judgment was entered against Waterman on January 28, 1992.

Travelers filed a timely notice of appeal. The Ninth Circuit stayed the appeal pending disposition of the lawsuit between Travelers and L.A. Water. That litigation concluded in March 1993.

## II.

1. *Did L.A. Water offer sufficient evidence to withstand Waterman's motions for partial summary judgment?*

COGSA regulates the liability of international carriers for loss or damage to cargo. Specifically, Section 4(5) of COGSA provides that a carrier is liable for $500 per package or per customary freight unit. 46 U.S.C. § 1304(5). The shipper may increase the carrier's liability, however, by declaring on the bill of lading the nature and value of the goods shipped and paying a higher freight rate. *Carman Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 899 (9th

Cir.1989). A carrier may take advantage of COGSA's $500 per package or per customary freight unit limitation on liability "only if the shipper is given a 'fair opportunity' to opt for a higher liability by paying a correspondingly greater charge." *Nemeth v. General S.S. Corp.,* 694 F.2d 609, 611 (9th Cir.1982) (citations omitted); *see Mori Seiki U.S.A., Inc. v. M.V. Alligator Triumph,* 990 F.2d 444, 448 (9th Cir.1993); *Carman Tool,* 871 F.2d at 899; *Komatsu, Ltd. v. States S.S. Co.,* 674 F.2d 806, 809 (9th Cir.1982); *Pan Am. World Airways, Inc. v. California Stevedore & Ballast Co.,* 559 F.2d 1173, 1176 (9th Cir.1977) (per curiam); *Tessler Bros. (B.C.), Ltd. v. Italpacific Line,* 494 F.2d 438, 443 (9th Cir. 1974).

The fair opportunity requirement is meant to give the shipper notice of the legal consequences of failing to opt for a higher carrier liability. Thus, the carrier must "bear an initial burden of producing prima facie evidence which demonstrates that it provided ... notice [of a choice of liabilities and rates] to the shipper." *Mori Seiki,* 990 F.2d at 449; *see Carman Tool,* 871 F.2d at 899. "Normally, the carrier can meet this initial burden by showing that the language of COGSA Section 4(5) is contained in the bill of lading." *Nemeth,* 694 F.2d at 611. The carrier may provide either an express recitation of COGSA Section 4(5), or language to the same effect. *Mori Seiki,* 990 F.2d at 449; *Pan Am.,* 559 F.2d at 1176. But, the language must be printed in a legible manner. *Nemeth,* 694 F.2d at 611–12 (holding that a carrier cannot meet the fair opportunity requirement by printing the liability limitation clause in a microscopic and blurry manner). And, "the mere incorporation of COGSA by reference is not adequate." *Mori Seiki,* 990 F.2d at 449; *Komatsu,* 674 F.2d at 809–10; *Pan Am.,* 559 F.2d at 1175–77.

Waterman's bill of lading incorporates by reference all provisions of COGSA.

---

**4.** Section 4(5) of COGSA provides: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... or in the case of goods not shipped in packages, per customary freight unit, ... unless the nature and

*See* Clause Paramount.[5] It also gives notice of both the $500 per package or per customary freight unit limitation on liability and the opportunity to opt out by declaring a higher value and paying a higher freight rate. *See* Liability of the Carrier Clause.[6] Accordingly, Travelers concedes that Waterman's bill of lading provides prima facie evidence that Waterman gave L.A. Water a fair opportunity to opt out of COGSA's $500 per package or per customary freight unit limitation on liability.

 Because Waterman met its burden, the burden shifted to Travelers to disprove that L.A. Water was given a fair opportunity to opt out of COGSA's liability limitation. *Mori Seiki,* 990 F.2d at 449; *Carman Tool,* 871 F.2d at 899. Travelers offered two pieces of evidence. First, L.A. Water submitted to Waterman prior to shipment the export declaration it prepared for customs. This export declaration reported the value of the total cargo to be $6,000,000. Travelers pointed out that in *Nemeth* this court found that such a detailed list of the contents and their value "can be interpreted as evidence ... that [the shipper] would have opted for a higher liability had [it] been given a fair opportunity to do so." *Nemeth,* 694 F.2d at 612.

Second, Waterman's bill of lading did not contain a designated space in which to declare a higher value. *Nemeth,* 694 F.2d at

value of such goods have been declared by the shipper...." 46 U.S.C. § 1304(5).

5. Clause Paramount provides, "This bill of lading shall have effect subject to the provisions of [COGSA].... All the provisions of [COGSA] ... are hereby incorporated herein and shall apply throughout the entire time the goods are in the carrier's custody...."

6. Liability of the Carrier Clause provides, "In case of any loss or damage to or in connection with goods exceeding in actual value $500 ... per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per customary freight unit, on which basis the freight is adjusted and the carrier's liability in any capacity, if any, shall be determined on a value $500 per package or per customary freight

612. Travelers noted that the *Nemeth* court considered "the fact that the bill of lading contains no designated place for an excess value declaration" to be evidence that the shipper did not have a fair opportunity to opt out of COGSA's liability limitation. *Id.*

We review de novo the district court's grant of partial summary judgment. *M/V American Queen v. San Diego Marine Const. Corp.,* 708 F.2d 1483, 1487 (9th Cir. 1983). We find that the evidence provided by Travelers did not raise a genuine issue of material fact as to whether L.A. Water was denied a fair opportunity to opt out of COGSA's liability limitation. First, L.A. Water's export declaration does not, in fact, constitute evidence that L.A. Water "would have opted for a higher liability had [it] been given a fair opportunity to do so." *Nemeth,* 694 F.2d at 612. Rather, if L.A. Water wanted a higher carrier liability, it would have contracted for it. L.A. Water is a sophisticated shipper of goods.[7] And, it had shipped its goods with Waterman on several previous occasions.[8] Thus, L.A. Water was familiar with Waterman's shipping procedures and its bill of lading. *See Institute of London Underwriters v. Sea–Land Serv., Inc.,* 881 F.2d 761, 766 (9th Cir.1989); *Carman Tool,* 871 F.2d at 901 n. 10. Accordingly, if L.A. Water had actually attempted to opt out of COGSA's limitation on liability, it would have succeeded. *See London Underwriters,* 881 F.2d at 766.

unit, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extra freight paid if required...."

7. Evidence of L.A. Water's sophistication includes: (1) the fact that L.A. Water negotiated its freight rates rather than using Waterman's standard freight rates; and (2) the fact that L.A. Water chose to insure its cargo through Travelers, an independent insurance company, rather than through Waterman, the carrier.

8. Waterman's regional manager declared that L.A. Water had shipped its goods with Waterman seven times prior to this shipment. Similarly, the stevedore's general manager declared that he had personally supervised the loading of ten to fifteen L.A. Water shipments.

Second, a designated place for an excess value declaration is not mandatory. *Mori Seiki*, 990 F.2d at 449. This court has specifically rejected a shipper's argument that the absence of a designated space to insert a higher value for the shipment is always evidence that the shipper was denied a fair opportunity to opt out of COGSA's liability limitation. *Id.*

▮ Moreover, a shipper who chooses to insure its cargo through an independent insurance company has made a conscious decision not to opt out of COGSA's liability limitation. In *Carman Tool*, the court explained, "Indeed, there is every reason to believe that [the shipper] made a knowing and deliberate choice in foregoing the additional cost that would have been incurred in raising the liability limit: it insured the shipment with St. Paul Fire and Marine Insurance Company." *Carman Tool*, 871 F.2d at 901 n. 10. Here, L.A. Water chose to insure its cargo through Travelers. There is every reason to believe that L.A. Water made a deliberate choice to forego the additional cost that would have been incurred in raising Waterman's liability limit. Why would L.A. Water increase its costs by insuring the same cargo twice?

This court has further noted that it is always in the best interest of a shipper's insurance company to argue that the shipper was denied a fair opportunity to opt for higher liability. The court observed, "As best we can tell, St. Paul is now bringing this lawsuit in an attempt to shift to [the carrier] the burden of loss it was paid to insure." *Id.* Indeed, Travelers is bringing this lawsuit now in an attempt to recover the $1,174,876 it was required to pay to L.A. Water.

For the foregoing reasons, L.A. Water did not produce sufficient evidence to overcome Waterman's motions for partial summary judgment.

2. *Did the district court apply a definition of "package" that has been rejected in the Ninth Circuit?*

▮ Travelers insists that the lost or damaged cargo was not packaged. Waterman maintains that it was. The district court agreed with Waterman. The district court's definition of "package" under Section 4(5) of COGSA is, however, a question of statutory construction and is subject to de novo review. *Van der Salm Bulb Farms, Inc. v. Hapag Lloyd, AG,* 818 F.2d 699, 701 (9th Cir.1987) (per curiam). We affirm.

Congress did not define the term "package" in COGSA. Consequently, courts have been struggling to formulate a definition since COGSA's enactment in 1936. This court has held that the term "package" is to be given its plain, ordinary meaning. *Hartford Fire Ins. Co. v. Pacific Far E. Line, Inc.,* 491 F.2d 960, 963 (9th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). The "plain, ordinary meaning" definition can be problematic, however. Clearly, cargo fully boxed or crated is a "package," particularly "where the mode of packaging conceals the identity of the goods being shipped." *Id.* at 964. Similarly, free-standing cargo not enclosed in a box or crate clearly constitutes "goods not shipped in a package." *Id.* But, what about cargo where some preparation for transportation has been made, but the mode of packaging does not completely conceal or enclose the goods? The answer is not always obvious. *Compare London Underwriters,* 881 F.2d at 768 (holding that a yacht shipped in an on-deck cradle constituted a package); *Bulb Farms,* 818 F.2d at 701 (holding that 872 uncovered plastic trays filled with flower bulbs constituted 872 packages, where each tray was surrounded by peat moss and contained holes on the sides and bottom to permit air circulation), *with Hartford Fire,* 491 F.2d at 965 (holding that a transformer to which a wooden skid was attached did not constitute a package).

Here, the district court noted that a COGSA "package" includes:

those pieces of cargo ... which were ... given some degree of packaging or other preparation for transportation designed to facilitate handling. Even if such packaging or preparation did not conceal or completely enclose the cargo, such pieces will

be found to be packages if the facts establish some degree of packaging or other preparation for transportation to facilitate handling.

On the basis of this language, Travelers argues that the district court did not apply the "plain, ordinary meaning" definition. Travelers asserts that instead, the district court applied a definition which is used by the Second Circuit, but was rejected by the Ninth Circuit. In *Aluminios Pozuelo, Ltd. v. S.S. Navigator*, 407 F.2d 152 (2d Cir.1968), the Second Circuit held that cargo is packaged where "some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Id.* at 155.

Clearly, the district court's language does, in fact, track the language used in *Aluminios*. But, the Ninth Circuit has never rejected such language. Indeed, such language is an inherent part of a "plain, ordinary meaning" analysis. Rather, the Ninth Circuit has rejected only that part of *Aluminios* that examines the subjective purpose of the packaging. *See Hartford Fire*, 491 F.2d at 965 (finding that whether a skid was attached for the purpose of transportation or protection was not determinative of whether the cargo constitutes a package). Specifically, the court has held, "Any distinction based upon the subjective purpose . . . should not be the test for resolving the issue." *Id.*

Travelers is correct that the district court erred by including subjective purpose language ("to facilitate handling"). But, the error is harmless. The district court's use of superfluous language does not constitute reversible error. *See Clauson v. Smith*, 823 F.2d 660, 663 n. 3 (1st Cir.1987) ("[I]f 'a reading of the colloquy and decision as a whole . . . indicates that, despite some loose use of language, the proper . . . standard was

applied,' we will not reverse on the basis of what amounts to a *lapsus linguae*." (quoting *United States v. Kobrosky*, 711 F.2d 449, 456 (1st Cir.1983))).

Travelers further argues that the Ninth Circuit has generally held that cargo is packaged only when the mode of packaging conceals the identity of the goods being shipped. This is not true. *See London Underwriters*, 881 F.2d at 768 (holding that a yacht shipped in an on-deck cradle constituted a package); *Bulb Farms*, 818 F.2d at 701 (holding that 872 uncovered plastic trays filled with flower bulbs constituted 872 packages).

Thus, Travelers failed to demonstrate how the district court erred by finding that the cargo constituted packages. In addition, Waterman offers the following affirmative explanation of why the district court was correct in finding that the cargo constituted packages. First, the cargo fit a plain, ordinary definition of "package." Unlike the cargo in *Hartford Fire*, none of the cargo here "was designed to stand freely." *Hartford Fire*, 491 F.2d at 961. The cargo could not have been "simply dumped in a hold and carried without some sort of 'packaging.' " Indeed, the stevedore's description of the packaging surrounding some of the cargo provides strong evidence that the cargo was shipped in packages.[9]

Second, the bills of lading designated the cargo as packages. *See Nemeth*, 694 F.2d at 613–14 (holding that the parties' designation on the bill of lading of the number of packages was determinative for COGSA purposes). The parties filled in the numbers 18, 103 and 165 under the column titled "No. of Pkgs." on Bills of Lading # 1, # 4, and # 5, respectively. *See All Pac. Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1433 (9th Cir.1993) ("The plain language of the bills of lading indicate [sic] that the carrier understood that it was shipping pack-

---

**9.** The extent to which the cargo was not free-standing is best illustrated by the stevedore's description of the packaging which surrounded 57 pieces of cargo. For example, the five girders were each "carried on 4 × 6 foot support skids which were placed underneath each girder and

secured by cables. Cables were additionally placed underneath the girder and secured to the side of the wall of the barge. An elliptical piece of steel was additionally attached to the girder with securing cable, turnbuckles and wall clamps."

ages...."), *cert. denied sub nom. Hanjin Container Lines v. Tokio Fire & Marine Ins. Co.,* —— U.S. ——, 114 S.Ct. 1301, 127 L.Ed.2d 653 (1994); *Nemeth,* 694 F.2d at 613–14 (finding that three packages were shipped because "[t]he bill of lading clearly reflected a shipment of three packages"); *see also Seguros "Illimani" S.A. v. M/V Popi P,* 929 F.2d 89, 94 (2d Cir.1991) ("The number appearing under the heading "NO. OF PKGS." is our starting point for determining the number of packages for purposes of the COGSA per-package limitation, and unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as "packages," it is also the ending point of our inquiry.").[10]

Furthermore, it was L.A. Water—not Waterman—that provided the information which appears on the bills of lading. This means two things. First, before the barge sank, L.A. Water believed the cargo was packaged. Second, before the barge sank, L.A. Water knew that Waterman's liability would be assessed on a "$500 per package" basis. *See Hanjin Yosu,* 7 F.3d at 1433 ("By listing the number of packages ..., the shipper availed itself of the opportunity to clarify the liability limits."). Finally, it was L.A. Water—not Waterman—that attached to the bills of lading riders that catalog the cargo and specify the numbers of "packages" involved. This is further evidence that, before the barge sank, L.A. Water believed the cargo was packaged.

We agree with Waterman. First, the cargo does appear to fit a plain, ordinary definition of "package." Although the cargo was not fully crated or boxed, it was also not freestanding. Indeed, the cargo at issue is more similar to the 872 plastic trays contain-

ing flower bulbs in *Bulb Farms,* which were found to be packages, than to the transformer in *Hartford Fire,* which was found not to constitute a package. Second, the bills of lading do designate the cargo as packages. *See Nemeth,* 694 F.2d at 613–14. And, it was L.A. Water that decided that the cargo was packaged. L.A. Water should not now be allowed to argue that the cargo was not packaged.

## CONCLUSION

For the foregoing reasons, we affirm. Travelers did not provide sufficient evidence that L.A. Water was denied a fair opportunity to opt out of COGSA's limitation on liability. L.A. Water had the option of declaring a higher value; it chose not to do so. That the cargo was actually worth substantially more than $38,500 is not relevant. Furthermore, the district court did not apply a definition of "package" which has been rejected by the Ninth Circuit. Rather, the district court properly found that 77 packages were lost or damaged. Thus, the district court properly granted Waterman's motions for partial summary judgment and entered final judgment accordingly.

AFFIRMED.

---

**10.** In *Belize Trading, Ltd. v. Sun Ins. Co.,* 993 F.2d 790 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994), the Eleventh Circuit found that the parties' designation of the number of packages on the bill of lading was not controlling. Waterman argues that *Belize* is distinguishable, however. We agree. In *Belize,* the bills of lading were not issued until after the cargo had been damaged. Thus, they were not contracts. Here, the bills of lading were issued before the cargo was shipped. Thus, they are binding contracts.