United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 14, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-30856
Summary Calendar

_____

INDUSTRIAL MARITIME CARRIERS
(BAHAMAS), INC.,

                                        Plaintiff-Appellee,

versus

SIEMENS WESTINGHOUSE POWER
CORPORATION; ET AL.,

                                        Defendants,

SIEMENS WESTINGHOUSE POWER
CORPORATION,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court for
the Eastern District of Louisiana
(USDC No. 01-CV-726-I)

_____

Before REAVLEY, BARKSDALE and CLEMENT, Circuit Judges.

PER CURIAM:[*]

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion
should not be published and is not precedent except under the limited circumstances

Siemens Westinghouse Power Corp. ("SWPC") contracted with Industrial Maritime Carriers (Bahamas), Inc. ("IMC") for the carriage of two generators from Masan, Korea to Houston, Texas on the vessel the M/V INDUSTRIAL BRIDGE. When the goods were offloaded, IMC discovered that the hold in which the generators were stored had flooded. SWPC contends the flood damage resulted in a total loss of the generators, valued at approximately $3,100,000 each.

IMC sought a declaratory judgment that its liability for the loss of the generators was limited to $500 per package under the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 et seq. ("COGSA"). See id. § 1304(5). SWPC filed a counterclaim alleging that IMC breached the contract of carriage and was liable for the full value of the two generators. The district court granted summary judgment in favor of IMC. SWPC appealed. We affirm the district court for the following reasons:

1.     We review a district court's grant of summary judgment de novo. Blanks v. Southwestern Bell Communications, Inc., 310 F.3d 398, 400 (5th Cir. 2002). Summary judgment is appropriate if the record discloses that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

2.     COGSA entitles a carrier to limit its liability for damage to or loss of packages in their care to $500 so long as the carrier provided the shipper with a fair

set forth in 5TH CIR. R. 47.5.4.

2

opportunity to eliminate the package limit by declaring the package's actual value and paying additional ad valorem freight. See 46 U.S.C. § 1304(5); Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415, 420 (5th Cir. 1981). It is undisputed that IMC gave SWPC an opportunity to declare excess value and pay ad valorem freight, as both the bill of lading and IMC's tariff on file with the Federal Maritime Commission so provided. The sole issue presented by this appeal is whether that opportunity was fair, as a carrier must offer a shipper a reasonable ad valorem charge to satisfy fair opportunity doctrine. Gen. Elec. Co. v. M/V Nedlloyd, 817 F.2d 1022, 1028 (2d Cir. 1987) (citing Hart v. Penn. R.R. Co., 112 U.S. 331, 341-42 (1884)). SWPC contends that, because the cost to IMC of insuring a package is 0.2568% of the cargo's actual value, IMC's 6% ad valorem freight is excessive and unreasonable and thus did not provide a fair opportunity to eliminate the $500 limit.

3. We find this case indistinguishable from General Electric Co. v. M/V Nedlloyd. In Nedlloyd, the court determined that "because [the carrier's] ad valorem rate exceeded what it cost [the shipper] to insure its cargo, it was not the ad valorem rate but the economics of insuring the cargo that prevented [the shipper] from declaring excess value." Id. at 1025. Moreover, the shipper "had no intention of declaring an excess value for its cargo," because it had made a business judgment long before the particular shipment not to explore the possibility of obtaining

3

greater protection at a higher rate. Id. at 1025, 1029. Accordingly, the Second Circuit held that it was the shipper's own cost-benefit analysis that prevented it from declaring excess value. Id. at 1029.

4.    SWPC's attempts to distinguish Nedlloyd from the present case are unconvincing. First, the record reveals that during the 1980's SWPC's Risk Manager investigated "whether it would be advantageous . . . to declare the higher value and pay the higher freight to eliminate the package limit." The Risk Manager determined that, although it was desirable to declare the actual value of the cargo to procure safe and prompt shipment, carriers throughout the industry charged ad valorem rates of 3% to 10% to eliminate the package limit. Because SWPC could purchase all-risk cargo insurance for between 0.2% and 0.3% of the insured goods' value, the Risk Manager concluded that the "exorbitantly high rates charged by ocean carriers made it absolutely impossible as a matter of practical economies" to declare the actual value of the shipments and pay ad valorem freight. Second, the record is devoid of evidence that SWPC inquired about declaring the excess value of the two generators. Nor is there evidence that SWPC took any steps toward actually declaring the value of its cargo, such as attempting to negotiate a lower ad valorem rate. Accordingly, we conclude that SWPC's policy not to declare excess value was a result of its own cost-benefit analysis, which revealed that the costs of declaring excess value outweighed the benefits. SWPC bears the burden of

4

proving that the rate was unreasonable, and the record lacks any evidence that SWPC's decision was causally related to the freight IMC would have charged to eliminate the $500 per package limit. See Nedlloyd, 817 F.2d at 1029 (stating that while the carrier bears the initial burden of proving fair opportunity, the shipper must prove that a fair opportunity did not in fact exist). SWPC's decision was instead based on the fact that it could ship its products for less if it self-insured.

5. SWPC attempts to distinguish this case from Nedlloyd on the ground that its policy was not to refrain from paying ad valorem rates; it was only to refrain from paying such rates until carrier began charging reasonable rates (apparently meaning rates that resulted in smaller profit margins). This argument assumes that the reasonableness of an ad valorem rate is dependent upon the carrier's profit margin. However, the reasonableness of an ad valorem charge depends only upon its relationship to the cargo's value, and thus the risk assumed by the carrier. See Nedlloyd, 817 F.2d at 1028 (citing Hart, 112 U.S. at 341-42 and Adams Express Co. v. Croninger, 226 U.S. 491, 510 (1913)). There is no authority for the proposition that the reasonableness of a rate of carriage is determined by the ratio between the ad valorem freight and the insurance cost to the carrier; thus, SWPC's cost-benefit analysis, which determined ad valorem rates were unreasonable in relation to insurance costs, does not support SWPC's claim that it determined all carriers' ad valorem rates were "unreasonable" as that term has been defined in the

fair opportunity doctrine by the Supreme Court.

6. Moreover, the Risk Manager's affidavit states that SWPC's decision not to declare excess value was driven by the fact that it could obtain shipper's insurance at a markedly lower rate than ad valorem freight charges. This was exactly the circumstance that faced the Nedlloyd court. See id. at 1025. Although SWPC vehemently asserts that its cost-benefit analysis hinged on the excessiveness of rates, the Second and Fourth Circuits have held that, absent evidence that the shipper attempted to obtain a reasonable ad valorem charge, it cannot now complain that the carrier's ad valorem rate was excessive. Id. at 1029; Aetna Ins. Co. v. M/V Lash Italia, 858 F.2d 190, 194 (4th Cir. 1988). SWPC contends that it was not required to inquire as to the reasonableness of IMC's ad valorem rate because "an axiomatic principle of law is that no party is required to do a vain and useless act," and SWPC knew every carrier charged an unreasonable rate. We are not convinced that efforts to obtain a lower rate would necessarily have been in vain, as there is no evidence in the record that SWPC made any attempt to obtain what it considered a reasonable ad valorem rate.

7. In any event, "it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss." Hart, 112 U.S. at

6

341. SWPC, an experienced shipper, was aware of the economic consequences of obtaining greater protection from the carrier at a higher rate or obtaining an insurance policy to cover its exposure. See Lash Italia, 858 F.2d at 194. It chose the later course. The fact that its choice will now result in larger insurance premiums in the future may be unfortunate for the company, but it does not mean it was not given a fair opportunity to make a different choice.

8. Lastly, SWPC argues that the district court erred by applying Travelers Indemnity Co. v. Vessel Sam Houston, 26 F.3d 895 (9th Cir. 1994), to determine that SWPC's procurement of insurance is evidence of "a conscious decision not to opt out of COGSA's liability limitation." Id. at 900. SWPC argues that, in light of the several defenses available to carriers under COGSA, see 46 U.S.C. § 1304(2), a prudent shipper will obtain all-risk insurance even if it declares the cargo's excess value and pays ad valorem freight. Assuming without deciding that SWPC is correct, we conclude any error by the district court was harmless. SWPC's own evidence demonstrates that its cost-benefit analysis, and not the excessiveness of IMC's 6% ad valorem freight, prevented it from declaring the generators' actual value. Accordingly, SWPC cannot establish that it was denied a fair opportunity to opt out of COGSA's $500 per package liability limitation.

AFFIRMED.