HENLEY DRILLING COMPANY,
Plaintiff, Appellee,

v.

William H. McGEE and CNA Casualty of
Puerto Rico, Defendants, Appellants.

HENLEY DRILLING COMPANY,
Plaintiff, Appellee,

v.

MARINE TRANSPORTATION SERVIC-
ES, etc. and Luis A. Ayala Colon Sucrs.,
Inc., Defendants, Appellants.

Nos. 93–1543, 93–1548.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1994.

Decided Sept. 27, 1994.

---

Keith A. Graffam, with whom Dario Rivera Carrasquillo, John E. Mudd and Cordero, Miranda & Pinto, Old San Juan, PR, were on brief, for plaintiff.

Jose F. Sarraga, San Juan, PR, for defendant Marine Transp. Services.

Eugene F. Hestres, with whom Bird, Bird & Hestres, San Juan, PR, was on brief, for defendant Luis A. Ayala Colon Sucrs., Inc.

Before TORRUELLA, Circuit Judge, ALDRICH, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

The central question in this case—whether the $500 per-package limit on ocean carriage liability imposed by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1304(5), is applicable to an oil drilling rig—requires the court to consider for the first time the COGSA-related "fair opportunity" doctrine.

# I

## BACKGROUND

Puerto Rico Electric Power Authority (PREPA) contracted with Henley Drilling Company (Henley) to conduct petroleum drilling operations in Puerto Rico. Marine Transportation Services–Sea Barge Group, Inc. (Sea Barge), an ocean carrier, agreed to transport Henley's drilling equipment from Houston to Puerto Rico, and return. PREPA obtained marine cargo insurance on the Henley drilling rig through William H. McGee & Co. (McGee) and CNA Casualty of Puerto Rico (CNA). Following an uneventful southbound voyage, Sea Barge retained a stevedoring contractor, Luis A. Ayala Colón Sucrs., Inc. (Ayacol), to stow the drilling rig aboard the barge for the return trip to Houston. When the barge arrived in Houston, however, Henley's huge drilling rig, valued at $629,000, was nowhere to be found.

Henley sued Sea Barge, Ayacol, McGee, CNA and PREPA in the United States District Court for the District of Puerto Rico. Under the terms of their settlement agreement, PREPA, McGee and CNA were subrogated to the rights of Henley, leaving Sea Barge and Ayacol as the only defendants. In March 1992, Sea Barge and Ayacol moved for partial summary judgment, contending that their liability, if any, could not exceed the $500 per-package/CFU limit imposed by COGSA.[1] Contemporaneously, Ayacol and Sea Barge moved for summary judgment on the further ground that the stowing of the

drilling rig aboard the barge for the return trip to Houston was improperly supervised by the marine surveyor retained by PREPA, thereby entitling Ayacol and Sea Barge to exoneration from liability.

A magistrate judge recommended partial summary judgment in favor of Sea Barge and Ayacol, based on a finding that the drilling rig constituted a "package" within the meaning of COGSA § 4(5), for which the maximum liability of the carrier is $500.[2] The magistrate judge did not rule on the summary judgment claim for exoneration. McGee, CNA and PREPA objected to the magistrate-judge's report and recommendation, which the district judge subsequently adopted over their objection. McGee, CNA and PREPA unsuccessfully moved for reconsideration by the district judge. CNA and McGee [collectively: "McGee"] appealed. Ayacol and Sea Barge cross-appealed, challenging the district court order adopting the magistrate-judge's report and recommendation insofar as it failed to grant Ayacol and Sea Barge exoneration from all liability and included no attorney fee award against McGee.

# II

## DISCUSSION

### A. The McGee Appeal (No. 93–1543)

#### 1. Summary Judgment Standard

We review a grant of summary judgment de novo. Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1050 (1st Cir.1993). Summary judgment is appropriate where the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Velez–Gomez v. SMA Life Assur. Co., 8 F.3d 873, 874–75 (1st Cir.1993).

#### 2. The COGSA Liability Limitation

Section 1304(5) of COGSA, entitled "Rights and immunities of carrier and ship," provides in relevant part:

---

1. The COGSA-imposed liability limit applies to each package or "customary freight unit" ("CFU").

2. See note 1 supra.

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... or in case of goods not shipped in packages, per customary freight unit ... *unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading....*

By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed ... [but] in no event shall the carrier be liable for more than the amount of damage actually sustained.

46 U.S.C.App. § 1304(5) (emphasis added).

■ The courts generally have required the carrier to afford the shipper a "fair opportunity" to avoid the COGSA "package/CFU" liability limitation through adequate advance notice. *See, e.g., Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 899 n. 3 (9th Cir.1989). As this court has not adopted the COGSA "fair opportunity" doctrine, *see Granite State Ins. Co. v. M/V Caraibe*, 825 F.Supp. 1113, 1118–24 (D.P.R.1993) (noting absence of First Circuit precedent on "fair opportunity" doctrine), we first examine the case law in other jurisdictions.

All courts which have addressed the matter require the carrier to provide the shipper some notice of the COGSA "package/CFU" liability limitation, differing only as to the type of notice. *See id.* (examining circuit split as to level of notice required); *see generally* Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act (Part I)*, 19 J.Mar.L. & Com. 1, 13–17 (1988) (hereinafter, "*Sturley*, Part I"); Michael F. Sturley,

*The Fair Opportunity Requirement (Part II)*, 19 J.Mar.L. & Com. 157 (1988) (hereinafter, "*Sturley*, Part II"). The Ninth Circuit is thought to have the more demanding notice requirement, *see* 2A Ellen Flynn & Gina A. Raduazzo, *Benedict on Admiralty* § 166, at pp. 16–28 to 16–29 (Michael F. Sturley, contrib. ed. 1993) (hereinafter, 2A *Benedict*) (describing "strict" Ninth Circuit standard, citing cases), mandating that the carrier provide the shipper legible written notice of the COGSA "package/CFU" liability limitation in the bill of lading, employing language substantially similar to COGSA § 4(5). *See, e.g., Nemeth v. General S.S. Corp.*, 694 F.2d 609, 611 (9th Cir.1982). Other courts, including the Second, Fourth, Fifth and Eleventh Circuits, simply require that the bill of lading include a "clause paramount" incorporating COGSA by reference. *See, e.g., Insurance Co. of N. Am. v. M/V Ocean Lynx*, 901 F.2d 934, 939 (11th Cir.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991); *General Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022, 1029 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988); *Cincinnati Milacron, Ltd. v. M/V American Legend*, 804 F.2d 837, 837 (4th Cir.1986) (en banc) (per curiam), *rev'g* 784 F.2d 1161 (4th Cir.1986); *Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 424 (5th Cir.1981). The courts are in agreement that the carrier bears the burden of proving that it has afforded the shipper the requisite "fair opportunity" notice. *See, e.g., General Elec.*, 817 F.2d at 1029; *Tessler Bros. (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 443 (9th Cir.1974).

Our review leads us to conclude that the bill of lading in this case afforded "fair opportunity" notice sufficient to satisfy whatever essential requirements are imposed by these other courts. Constructive notice was afforded by the "clause paramount"[3] legibly

---

**3.** The bill of lading included a typical "clause paramount":

    1. CLAUSE PARAMOUNT: This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act, approved April 16, 1936.

*See also* 46 U.S.C.App. § 1312 ("any bill of lading ... containing an express statement that it shall be subject to the provisions of [COGSA]

shall be subjected hereto as fully as if subject hereto by the express provisions of [COGSA] ... *Provided further,* that every bill of lading ... shall contain a statement that it shall have effect subject to the provisions of [COGSA]") (emphasis original); *cf. Komatsu Ltd. v. States S.S. Co.*, 674 F.2d 806, 810 n. 6 (9th Cir.1982) (rejecting statutory challenge to "fair opportunity" doctrine based on § 1312, because this section "leaves a

printed on the reverse side of the bill of lading: "This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act...." *See Cincinnati Milacron,* 804 F.2d at 837 ("clause paramount" provides constructive notice).[4] A more particular notice was contained in the bill of lading "valuation clause":

20. VALUATION. Carrier shall not be liable in any event for any loss, damage, misdelivery or delay with respect to the goods in an amount exceeding $500.00 lawful money of the United States per package, or in the case of goods not shipped in packages, per customary freight unit, unless the nature of the goods and a valuation thereof higher than $500.00 is declared in writing by Shipper on delivery of the goods to Carrier and inserted in the Bill of Lading and extra freight is paid thereon as required by the applicable tariff to obtain the benefit of such higher valuation.

*See Carman Tool,* 871 F.2d at 899 n. 4 (finding that bill of lading provision substantially similar to that *sub judice* recited terms of COGSA § 4(5) and thus afforded actual notice); *cf. supra* pp. 144–45 (quoting 46 U.S.C.App. § 1304(5)).[5]

■ McGee contends that Sea Barge did not demonstrate its entitlement to summary judgment on compliance with the "fair opportunity" requirement because there was competent evidence that Sea Barge failed to offer PREPA *ad valorem* rates based on the true value of the cargo. Specifically, McGee reiterates its claim below that Sea Barge failed

to show that published tariffs were available for a drilling rig on this voyage.[6] McGee relies primarily on the Fifth Circuit's language in *Brown & Root:*

[T]he circumstances of the case before us do not overcome the prima facie evidence of the opportunity for a choice of rates and valuations ... First, COGSA was expressly incorporated in the bill of lading to thereby bring into play § 4(5). Next, and *more significantly, the published tariff* which has the effect of law very carefully *gave Shipper a choice of valuations by a choice of precisely definable freight rates.*

648 F.2d at 424 (emphasis added, citations omitted); *see also Wuerttembergische v. M/V Stuttgart Express,* 711 F.2d 621, 622 (5th Cir.1983) (per curiam) (similar, applying *Brown & Root* ). The controlling question before us therefore becomes: whether actual and constructive notice, without more, affords the shipper "fair opportunity," as a matter of law.

Careful examination of the authorities has disclosed no appellate case which requires a valid tariff—in addition to actual or constructive notice—as an element of the "fair opportunity" doctrine. The Fifth Circuit, whose cases constitute the principal authority relied on by McGee, has reserved judgment on this matter:

The facts of [*Brown & Root,* 648 F.2d at 424, and *Wuerttembergische,* 711 F.2d at 622] reveal that we have *not* held ... that the mere incorporation of COGSA into a bill of lading constitutes prima facie evi-

---

carrier free to quote the language of section 4(5) in full").

4. McGee does not challenge the legibility of the COGSA notice. *Cf. Nemeth,* 694 F.2d at 611–12 (illegible recitation of COGSA § 4(5) does not provide "fair opportunity" notice).

5. In light of our conclusion that the bill of lading met whatever "fair opportunity" notice requirements are imposed by other circuits, we refrain from embracing the "fair opportunity" doctrine itself, in any form. We take this course because the parties have assumed, from the outset, that a COGSA-related "fair opportunity" doctrine would apply. Thus, we leave for another day, and a proper adversarial setting, what we perceive to be a problematic question. *See* Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the*

*Misinterpretation of the Carriage of Goods by Sea Act (Part I),* 19 J.Mar.L. & Com. 1 (1988); *and* Michael F. Sturley, *The Fair Opportunity Requirement (Part II),* 19 J.Mar.L. & Com. 157, 176 (1988) ("All of the available evidence suggests that the [COGSA] package limitation should not be subject to a fair opportunity requirement.").

6. McGee relies on a deposition by William Lauderdale, the Sea Barge agent responsible for negotiating freight charges with PREPA, which states that the rate for transporting the drill rig was "outside" the tariff Sea Barge filed with the Federal Maritime Commission, because this was "a single shipper on a single voyage, on a contract voyage." The record does not contain a copy of the Sea Barge tariff. *Cf. infra* note 7.

dence of fair opportunity. *Because that circumstance is not before us in this case, we express no opinion on the issue.* Couthino, Caro & Co. v. M/V Sava, 849 F.2d 166, 170 n. 6 (5th Cir.1988) (emphasis added). Other courts of appeals either directly *hold* that a tariff is not required if notice of the COGSA liability limitation has been given, *see, e.g., Ocean Lynx,* 901 F.2d at 939 ("*Brown & Root* thus adopted a system of constructive notice of an opportunity to declare excess valuation. Either a clause paramount in the bill of lading *or* a valid tariff filed with the Federal Maritime Commission ... is sufficient to afford the shipper an opportunity to declare excess value.") (citations omitted, emphasis added),[7] or clearly *imply* such a rule, *see, e.g., Aetna Ins. Co. v. M/V Lash Italia,* 858 F.2d 190, 193 (4th Cir.1988) ("In this case [language reciting the COGSA liability limitation in the] bill of lading establishes *prima facie* evidence of fair opportunity by clearly outlining the limitation of liability and explaining the shipper's opportunity to avoid the limitation by declaring a higher value."); *Carman Tool,* 871 F.2d at 901 ("so long as the bill of lading, on its face, provides adequate notice of the liability limit and an opportunity to declare a higher value, the carrier has discharged its responsibility") (9th Cir.); *cf. Komatsu,* 674 F.2d at 811 (published tariff, without actual notice of the

relevant provisions of COGSA, does not satisfy "fair opportunity" requirement).

We thus eschew McGee's implicit invitation to augment the "fair opportunity" doctrine. As the Ninth Circuit observed in a similar context:

> We decline to expand the fair opportunity requirement as suggested by [shipper]. The requirement is not found in the language of COGSA; it is a judicial encrustation, designed to avoid what courts felt were harsh or unfair results. The requirement has been criticized for introducing uncertainty into commercial transactions that should be governed by certain and uniform rules.

*Carman Tool,* 871 F.2d at 900 (citations omitted); *see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 29 F.3d 727, 728 (1st Cir.1994) ("COGSA was ... intended to reduce uncertainty concerning the responsibilities and liabilities of carriers, responsibilities and rights of shippers, and liabilities of insurers.") (citations omitted); *see generally Sturley,* Parts I, II (criticizing "fair opportunity" doctrine as economically inefficient and inconsistent with COGSA's roots in international and domestic law).[8] The bill of lading indisputably provided both actual and constructive notice of the COGSA § 4(5) liability limitation.[9] As there was no material fact in

---

**7.** Though the published tariff in *Ocean Lynx* "provide[d] that an *ad valorem* rate shall be applied to shipments of certain commodities [but did] not provide for the method through which a shipper of goods other than the listed commodities can avoid COGSA section 4(5)'s limitation on liability," 901 F.2d at 940, the court found that incorporation of COGSA into the bill of lading satisfied the "fair opportunity" requirement, *id.* The argument rejected by the Eleventh Circuit is very similar to that advanced by McGee. *See supra* note 6.

**8.** Further, nothing in the facts of this case counsels extension of the "fair opportunity" doctrine. McGee has not shown that the absence of relevant published tariffs prevented PREPA from avoiding the COGSA liability limitation. We will not *presume* that PREPA, McGee's insured, would have declared additional value under a published tariff, especially since PREPA's contract with Henley *obligated it* to provide marine cargo insurance for the *full replacement value* of the drilling rig. *Compare Travelers Indemn. Co. v. Vessel Sam Houston,* 26 F.3d 895, 900 (9th Cir.1994) (because shipper obtained insurance

through an independent underwriter, "there is every reason to believe that [the shipper] made a deliberate choice to forego the additional cost that would have been incurred in raising [the COGSA] liability limit"). Indeed, Sea Barge proffered uncontroverted evidence that though it offered insurance, PREPA declined, opting instead to purchase insurance through McGee.

Professor Sturley has suggested that in the typical case, the *ad valorem* rates for excess value offered by a carrier are higher than premiums for equivalent cargo-insurance coverage from a third-party underwriter. *See Sturley,* Part II, at 194. A rational shipper confronted with such a choice is not likely to pay *ad valorem* rates when third-party insurance coverage is less expensive. Moreover, a judicially-imposed tariff requirement would increase transaction costs to the carrier, with no corresponding benefit to either party.

**9.** McGee also argues that because David Kiester, the PREPA agent who negotiated the bill of lading with Sea Barge, allegedly was inexperienced in maritime matters, knowledge of the effect of COGSA § 4(5) may not be imputed to PREPA.

genuine dispute, the district court properly granted summary judgment for Sea Barge/Ayacol on the ground that the COGSA "package/CFU" liability limitation applies.

### 3. COGSA Package/Customary Freight Unit

■ COGSA § 4(5) limits liability to "$500 per package ... or in case of goods not shipped in packages, per customary freight unit." 46 U.S.C.App. § 1304(5). The district court concluded that the drill rig was shipped as a single "package." Strictly speaking, of course, it was not a "package." The parties agree that "the actual cargo that was lost overboard was a truck mounted Cabot 900 Drilling rig, which was self propelled and had eighteen (18) wheels ... [and which] was *not boxed or crated in any way.*" McGee's Mot. Opposing Def.'s Mot. for Summ. J. at 5–6 (emphasis added); *compare* Sea Barge's Resp. to Pl.'s Statement of Uncont. Mat. Facts at 4 (expressly admitting these facts). Moreover, we have held that a printing press shipped "in open view, unboxed, [which] was not wrapped or crated ... was not a package as defined by COGSA." *Hanover Ins. Co. v. Shulman Transp. Enters., Inc.,* 581 F.2d 268, 275 (1st Cir.1978); *accord Tamini v. Salen Dry Cargo AB,* 866 F.2d 741, 743 (5th Cir. 1989) (free-standing portable drilling rig, "for the most part" fully exposed and not enclosed in a container, was not a COGSA "package"); *Petition of Isbrandtsen Co.,* 201 F.2d 281, 286 (2d Cir.1953) (uncrated locomotive not COGSA "package"); 2A *Benedict,*

*supra,* § 167, at 16–35 ("cargo that is shipped without any packaging whatsoever is generally treated as 'not shipped in packages' ") (citations omitted, citing numerous cases). How, then, since the shipper chose to describe the shipment as a single package can it now claim it constituted multiple units?

Thus, the drilling rig constituted but one unit, whether labeled a "package" or, more correctly, one "customary freight unit" (CFU). Within the meaning of COGSA, the CFU "is generally the unit on which the freight charge is based for the shipment at issue." *Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam",* 759 F.2d 1006, 1016 (2d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985); *Granite State,* 825 F.Supp. at 1126.[10] To determine the unit upon which freight was charged we look "to the parties' intent, as expressed in the Bill of Lading, applicable tariff, and perhaps elsewhere." [11] *Croft & Scully Co. v. M/V Skulptor Vuchetich,* 664 F.2d 1277, 1282 (5th Cir. 1982); *see FMC Corp. v. S.S. Marjorie Lykes,* 851 F.2d 78, 80 (2d Cir.1988) (in determining the CFU, "district court should examine the bill of lading, which expresses the contractual relationship in which the intent of the parties is the overarching standard") (citations omitted).

In support of its motion for summary judgment, Sea Barge argued that it charged a lump sum for transporting the drilling rig on the northbound voyage.[12] Sea Barge relied

The only case McGee cites for this proposition, see *Pan American World Airways v. California Stevedore & Ballast Co.,* 559 F.2d 1173, 1177 (9th Cir.1977) (holding that "clause paramount" *alone* cannot be used to impute knowledge of effect of COGSA to shipper), is inapposite. Moreover, we conclude that Kiester's inexperience is immaterial to our analysis. *Cf. Carman Tool,* 871 F.2d at 901 n. 9 ("So long as the bill of lading has all the necessary information [i.e., gives actual notice of COGSA § 4(5)], *the shipper, or any other interested party,* has the means of learning everything it may wish to know about the terms of the transaction.") (emphasis added).

**10.** Some early cases looked to shipping-industry custom in determining the CFU. *See, e.g., Waterman S.S. Corp. v. United States Smelting, Ref. & Mining Co.,* 155 F.2d 687, 693–94 (5th Cir.), *cert. denied,* 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946). But the clear modern trend is to "recognize the customary freight unit as the unit specif-

ically employed by the parties in arriving at the rate charged for shipment," *Granite State,* 825 F.Supp. at 1126; *see, e.g., FMC Corp. v. S.S. Marjorie Lykes,* 851 F.2d 78, 80 (2d Cir.1988); *see also* Jerome C. Scowcroft, *Recent Developments Concerning the Package Limitation,* 20 J.Mar.L. & Com. 403, 412 (1989) (discussing modern cases); 2A *Benedict, supra,* § 168, at pp. 16–46 to 16–47 (same).

**11.** Since the bill of lading is the contract of carriage between shipper and carrier, Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 93 (2d ed. 1975), familiar principles of contract interpretation govern its construction, *see Croft & Scully Co. v. M/V Skulptor Vuchetich,* 664 F.2d 1277, 1282 (5th Cir.1982).

**12.** It is undisputed that the freight charges for the *southbound* voyage, totalling $164,583, were calculated on a short-ton basis, as evidenced by

on the bill of lading, PREPA's acceptance of the bid/purchase order (purchase order), and a facsimile from Sea Barge to PREPA quoting the charge for the northbound voyage ("quoted charge"). The purchase order and the quoted charge clearly establish that the freight charge was based on a lump sum:

[PURCHASE ORDER]

Charges will be as follows:

a) Ocean Transportation

—Drill rig & acc.: $86,400 lumpsum

b) Port charges & handling fees

—San Juan arrimo: $5.00/2,000 lbs

—Houston Wharfage: 1.50/2,000 lbs

—Houston truck loading: $7.50/2,000 lbs

[QUOTED CHARGE]

David, I have finalize [sic] shipping charges for this move and wish to give you our charges to move this rig to Houston, Texas.

. . . . .

Charges ocean transportation:
Drill rig and accessories loose.   $86,400.00 lumpsum
. . .
Port charges and handling fees:
San Juan Arrimo            $5.00 per 2000 lbs
Houston Wharfage           $1.50 per 2000 lbs
Houston truck loading      $7.50 per 2000 lbs

the bill of lading. It is not clear from the record exactly why the parties opted for a lump-sum contract rate on the northbound voyage, but the Lauderdale deposition suggests that Sea Barge's

The relevant portion of the bill of lading is substantially the same, though it does not use the term "lump sum."[13] This evidence was sufficient to establish that Sea Barge was entitled to summary judgment on its claim that the northbound freight charge was based on a lump sum. *See FMC Corp.*, 851 F.2d at 81 (bill of lading established that CFU was calculated on lump-sum basis).

McGee argues that listing wharfage and terminal usage charges by short ton (st) on the bill of lading established the short ton as the CFU. We think this argument cuts the other way. The portion of the bill of lading reproduced above, *see supra* note 13, sets out the charge per short ton *only* for wharfage and terminal usage, whereas the freight charge is stated in a lump sum. And this reading is buttressed by the quoted charge and the purchase order, which clearly evince the intent of the parties to calculate the freight charge on a lump-sum basis.

Sea Barge having carried the initial burden on its motion for summary judgment, the burden shifted to McGee to point to competent evidence indicating a trialworthy issue.

13. expenses would be lower for the trip to Houston because the barge to be used on the return leg was already positioned in Puerto Rico.

| TARIFF ITEM NUMBER | CHARGES | TOTAL |
|---|---|---|
| *CONTRACT* | | *86,400.00* |
| | | |
| TOTAL THRU FREIGHT | | |
| WHARFAGE *1.50 st* | | *1,322.25* |
| TERMINAL USAGE(1)*PR 5.00 st* | | *4,407.50* |
| TERMINAL USAGE(2)*US 7.50 st* | | *6,611.25* |
| TOTAL CHARGES | --------→ | *98,741.00* |

(Italicized characters are typed in the original; all other characters are pre-printed in the bill of lading.)

*See Local 48 v. United Bhd. of Carps. & Joiners,* 920 F.2d 1047, 1050 (1st Cir.1990). In support of its claim that freight charges were based on the short ton, McGee proffered the Sea Barge invoice to PREPA relating to the northbound voyage, and a portion of the deposition testimony of William Lauderdale. The invoice is similar in all relevant respects to the portion of the bill of lading set out in the margin. *See supra* note 13. A flat $86,400 charge is made for "Ocean freight," while wharfage and terminal charges are listed on a short-ton basis. Although, as McGee points out, other portions of the invoice and bill of lading reflect that the drilling rig weighed 1,726,000 pounds, there is nothing to link weight with the *freight* charge, and McGee made no proffer supporting such a link.[14]

More importantly, the Lauderdale deposition tendered by McGee states that Lauderdale calculated the charges for the northbound voyage based on *Sea Barge's expenses,* including the costs of operating the vessel; agency, port, stevedoring and container costs; as well as a profit margin. Nowhere does Lauderdale intimate that the drilling-rig weight was a factor in calculating the freight charge or in the parties' discussions of the freight charge for the northbound voyage. Thus, we find no competent evidence that the freight charge was based on anything other than a lump sum, *see S.S.*

*Marjorie Lykes,* 851 F.2d at 80–81 (finding that bill of lading and tariff established that parties intended to calculate freight on lump-sum basis), which means that the drilling rig itself was the CFU in this case. *Binladen,* 759 F.2d at 1016; *see Union Carbide Corp. v. M/V Michele,* 764 F.Supp. 783, 786 (S.D.N.Y. 1990) (CFU was transportable tank, since freight charge was computed on lump-sum basis).

## B. *The Cross Appeal (No. 93–1548)*

■ The Ayacol and Sea Barge cross-appeal challenges (1) the district court finding that the loading of the drilling rig was not controlled by PREPA to such an extent that Ayacol was exonerated from liability, and (2) the order denying Ayacol/Sea Barge an attorney fee award against McGee.[15] We deem these claims waived due to cross-appellants' failure to object to the magistrate-judge's report and recommendation within the ten-day period prescribed by 28 U.S.C. § 636(b)(1)(C). *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980)[16] ("[A] party 'may' file objections within ten days or he may not, as he chooses, but he 'shall' do so if he wishes further [appellate] consideration.").[17] *See also* Fed. R.Civ.P. 72(b) (same); D.P.R.Loc.R. 510.2(A) (failure to object to magistrate-judge's report

---

**14.** Even evidence that Sea Barge used the weight of the drill rig to calculate its *own* costs may not have been dispositive. *See M/V Lash Italia,* 858 F.2d at 193 ("[w]hile [carrier] may have considered the vehicles' dimensions in setting its freight rates, the mere consideration of a particular measure does not render it a customary freight unit"); *S.S. Marjorie Lykes,* 851 F.2d at 80–81 (even though preliminary negotiations indicated that carrier was calculating freight based on price per ton, the fact that the bill of lading and tariff unambiguously reflected a lump-sum rate was controlling).

**15.** Prior to briefing and oral argument, McGee moved to dismiss the Ayacol/Sea Barge cross-appeal for failure to comply with D.P.R.Loc.R. 510.2(A) (failure to object to magistrate-judge's report within ten days waives right to appellate review). On written submissions by the parties, we denied the motion without prejudice, specifically preserving McGee's right to address this issue in its appellate brief. Ayacol/Sea Barge

failed to respond to the waiver argument presented in McGee's brief, either at oral argument or in their principal brief on appeal, and filed no reply brief. Thus, we rely on the Ayacol/Sea Barge submissions in opposition to McGee's motion to dismiss.

**16.** The Supreme Court has made clear that the failure to make timely objection does not deprive the court of appeals of jurisdiction. *Thomas v. Arn,* 474 U.S. 140, 146 n. 4, 106 S.Ct. 466, 470 n. 4, 88 L.Ed.2d 435 (1985).

**17.** We reject the contention that the Ayacol/Sea Barge claim sought to be raised on cross-appeal was preserved by an oblique footnote reference in their joint memorandum *opposing McGee's objection* to the magistrate-judge's report. Their joint memorandum was not filed within the ten-day period prescribed by 28 U.S.C. § 636(b)(1)(C). *See Park Motor Mart.,* 616 F.2d at 605.

within ten days waives absolute right to appeal district court order).[18]

Ayacol/Sea Barge urge that timely objection is required only when a party challenges a finding actually set out in the magistrate-judge's report and recommendation. Thus, they assert no exception to the report *per se* but challenge the "fail[ure] to make the additional findings requested [in the motion for summary judgment]." We reject their contention, which would allow an aggrieved party to assert on appeal an argument never surfaced in the district court; namely, in this case, that the magistrate-judge's report failed to respond to the portions of the motion dealing with exoneration of liability and attorney fees. *See United States v. Nuñez,* 19 F.3d 719, 722 n. 8 (1st Cir.1994) (arguments not seasonably addressed to trial court may not be surfaced for first time on appeal) (citing cases).[19] Finally, the proposed bypass of the Article III judge would undermine the established role of the magistrate judge in the federal system:

> The purpose of the Federal Magistrates Act is to relieve courts of unnecessary work. Since magistrates are not Article III judges, it is necessary to provide for a redetermination by the court, *if requested,* of matters falling within subsection (b)(1)(B). *To require it if not requested would defeat the main purpose of the act.*

*Park Motor Mart,* 616 F.2d at 605 (footnote omitted) (emphasis added); *see also id.* at

605 n. 1 ("Nor can it be thought that a party could skip the district court and, in effect, appeal directly to us. We have no jurisdiction to review the determinations of magistrates").[20]

*We affirm the district court judgment for Sea Barge/Ayacol, dismiss the Sea Barge/Ayacol cross-appeal, and remand for further proceedings consistent with this opinion. All parties are to bear their own costs.*

---

**18.** The report and recommendation warned that "failure to comply with [D.P.R.Loc.R. 510.2(A)] precludes further appellate review." *See United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir. 1986) (directing inclusion of notice of waiver in magistrate-judge's reports).

**19.** Ayacol/Sea Barge point to *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220 (5th Cir.1991), as support for their theory. In *Wang,* plaintiffs did not object to the magistrate-judge's report with respect to its failure to treat plaintiffs' *res ipsa loquitur* defense against partial summary judgment. The Fifth Circuit rejected the defendant's argument that *Thomas v. Arn* barred the claim, stating: "[plaintiff] is still able *to request* that the issue be considered on appeal, even if it did not question the magistrate's findings." *Wang,* 922 F.2d at 225 (emphasis added), *citing Thomas,* 474 U.S. at 148–49, 106 S.Ct. at 471–72. Although the court did not detail the reasons for its decision, the referenced portion of *Thomas* states: "we need not decide whether the Act mandates a waiver of

appellate review absent [timely objection to the magistrate-judge's report]. We hold only that it does not forbid such a rule." *Id.* No other court has cited *Wang* on this point. We think *Wang* is better seen as support for the view that a court of appeals has *discretion* to adopt a rule allowing a party to raise a claim not preserved before magistrate-judge. Since this case presents no suitable occasion for such a rule, *see Park Motor Mart,* 616 F.2d at 605, we find *Wang* to be inapposite.

**20.** Additionally, we note that these claims likely would not succeed on the merits. Ayacol cites no case holding that a stevedore's duty of care may be delegated, *in toto,* to its marine surveyor. The district court case cited for this proposition, *see Royal Embassy of Saudi Arabia v. S.S. Ioannis Martinos,* 1986 A.M.C. 769 (E.D.N.C.1984), merely found a right to *contribution* from the marine surveyor. As concerns the request for attorney fees, Sea Barge/Ayacol established no conduct on the part of McGee which would warrant a fee award.