Bruce **WILBORN**, Plaintiff,

v.

Maureen E. **WALSH**, et al., Defendants.

Civil Action No. 07–11245–PBS.

United States District Court, D. Massachusetts.

Oct. 31, 2008.

Scott A. Katz, Office of the Attorney General, Boston, MA, for Defendants.

Mollie M. Kornreich, Keren Zwick, Sexuality and Gender Law Clinic, Morningside Heights Legal Services, Columbia University School of Law, New York, NY, Neal E. Minahan, Jr., McDermott Will & Emery LLP, Boston, MA, for Plaintiff.

## ORDER

PATTI B. SARIS, District Judge.

After hearing, I adopt the well-reasoned opinion of the Magistrate Judge.

### REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Bruce Wilborn ("Wilborn") is currently incarcerated at Bay State Cor-

rectional Center ("BSCC") where he is serving a life sentence for second degree murder with the possibility of parole. In November 2006, Wilborn had a parole hearing before the Massachusetts Parole Board which he claims was tainted by the Parole Board members' hostility and bias against him due to his professed homosexuality. He further alleges that he was subsequently denied parole because of his sexual orientation. He brings this action against Parole Board members Maureen Walsh, Mark Conrad, Doris Dottridge, Candace Kochin, Pamela Lombardini, Deborah McDonagh, and Thomas Merigan (collectively the "Parole Board") in their official capacities. The First Amended Complaint (Docket No. 17) sounds in four counts and alleges violations of Wilborn's federal constitutional rights to equal protection (Count I) and due process (Count II), as well as violations of his Massachusetts state constitutional rights to equal protection (Count III) and due process (Count IV).

The matter is presently before the court on the Defendants' "Motion to Dismiss First Amended Complaint" ("Motion to Dismiss") (Docket No. 21). Defendants argue that plaintiff's complaint should be dismissed because (1) his state-law claims for declaratory and injunctive relief (Counts III and IV) are barred by the Eleventh Amendment and sovereign immunity, (2) his due process claims (Counts II and IV) are not cognizable because Wilborn has no constitutionally protected liberty interest in parole, and (3) all of his claims fail to state a claim because Wilborn has failed to allege sufficient facts to demonstrate that his parole was denied on the basis of his sexual orientation. Because Wilborn has alleged sufficient facts to support his federal due process and equal protection claims, but this court is barred from issuing declarative and injunctive relief against the Parole Board members

regarding violations of state law, this court recommends to the District Judge to whom this case is assigned that the Defendants' Motion to Dismiss (Docket No. 21) be ALLOWED as to Wilborn's state law claims (Counts III and IV) and DENIED as to his federal claims (Counts I and II).

## II. *STATEMENT OF FACTS*

### *Motion to Dismiss Standard of Review*

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (additional citations and internal punctuation omitted)). Nevertheless, to survive a motion to dismiss "the factual allegations in a complaint must 'possess enough heft' to set forth 'a plausible entitlement to relief.'" *Gagliardi v. Sullivan,* 513 F.3d 301, 305 (1st Cir.2008) (quoting *Twombly,* 127 S.Ct. at 1966–67). "In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). In doing so, the court may consider documents attached to or expressly incorporated in the Complaint, as well as "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to the plaintiff's claim," and "documents sufficiently referred to in the complaint" without converting the motion into one for summary judgment. *Id.* at 3–4 and cases cited.

Applying these standards, the relevant facts are as follows.

### Statement of Facts

Bruce Wilborn pled guilty to second-degree murder in 1985 and was sentenced to life in prison with the possibility of parole. (Plaintiff's First Amended Complaint ("Compl.") at ¶ 22). He is currently incarcerated at Bay State Correctional Center ("BSCC") in Norfolk, Massachusetts, and describes himself as an "openly gay prisoner." (Id. at ¶ 5). The defendants are all voting members of the Massachusetts Parole Board and are sued only in their official capacity. (Id. at ¶¶ 6–13). With the exception of Conrad and Lombardini, all were voting members in November 2006 when the events at issue in this case took place. Since this action was filed, McDonagh has completed her term on the Board and will be replaced as a party when her successor is named. (Plaintiff's Opposition to Defendants' Motion to Dismiss (Docket No. 26) ("Opp.") at 2).[1]

### Wilborn's Term of Incarceration

Wilborn has been incarcerated for twenty-four years. (Compl. at ¶ 14). He contends that he has been a model prisoner, with only one notable, fifteen-year-old disciplinary infraction on his record.[2] (Id.). Wilborn has participated in many of the rehabilitative and educational opportunities offered at BSCC as well as in community service activities. (Id. at ¶¶ 15, 17). He has developed a supportive relationship with Pastor James Lydon, a Universalist pastor at the Community Church of Boston. (Id. at ¶ 16). Wilborn has also authored two published books while incarcerated and is currently working on his third. (Id. at ¶ 18).

Wilborn does not have any drug, alcohol, or mental health issues. (Id. at ¶ 19; see also Massachusetts Parole Board Record of Decisions ("Dec.") at 2).[3] Since his incarceration, Wilborn has had one other parole hearing before the Parole Board in November 2001. (Compl. at ¶ 24). The Parole Board denied parole, by a 4–2 vote, "based on a dispute over Mr. Wilborn's role in the 1983 crime" and set a term of five years for future reconsideration. (Id.).

### The November 2006 Parole Board Hearing

Wilborn had his second hearing before the Parole Board on November 7, 2006. (Id. at ¶ 27.) During the time between his hearings, Wilborn contends that he did not commit any disciplinary infractions and that he continued to be involved in the rehabilitative and community programs at the prison. (Id. at ¶ 26). In addition, Wilborn submitted to a polygraph test before the 2006 hearing to "[address] the Board's reasoning for denying parole in 2001" and presented this and other evidence to prove his secondary role in the 1983 crime. (Id. at ¶ 50). In its Decision, the Board acknowledged this evidence, but found that "there is strong evidence that Mr. Wilborn was the individual who stabbed Mr. Weinstock" 36 times. (Dec. at 1–2). Nevertheless, the Board express-

---

1. The plaintiff named all the members of the Parole Board as of the date of the filing of the complaint. See Opp. at 2 n. 1. Fed.R.Civ.P. 25(d) provides that "[w]hen a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while an action is pending ... [t]he officer's successor is automatically substituted as a party."

2. The nature of this infraction is in dispute, and will be discussed in greater detail below.

3. A copy of the Decision is attached to the Defendants' Memorandum of Law ("Mem.") (Docket No. 22). The Decision is referenced in the Complaint and is appropriately considered in connection with this motion to dismiss.

ly stated that "the issue of who actually committed the murder is not relevant" to its decision denying parole, and that it "will take no position" as to who stabbed the victim. (*Id.* at 2).

### Statements Made By Board Members

During the course of the hearing, several members of the Board made statements that Wilborn alleges indicated bias against him on the basis of his homosexuality. (Compl. at ¶ 28). These allegedly suspect statements were made by three of the six voting Board members: Dottridge, Walsh, and Merigan. As Wilborn alleges in relevant part:

> Defendant Dottridge said that Mr. Wilborn's openness about being gay demonstrated a lack of rehabilitation. Defendant Dottridge said, "[W]hatever lifestyle you have chosen ... I think you go overboard with it. And I wonder if you've done any counseling to address that because you've gone from hiding it to now throwing it out every minute ... I don't know if you've learned anything."
>
> Defendant Dottridge also stated, "We've all had things happen to us, whether you are gay, whether you are black, whether you are Hispanic, we could carry that card or play those cards all day long ... [T]his whole conversation it's been about you being gay." She went on to assert, "I don't have a problem with that—with him sayin' that he's gay. I just think using it over and over again, just like, I don't go around sayin' I'm a heterosexual all day long."

(*Id.* at ¶¶ 29–30). Wilborn alleges that contrary to these assertions, he "only referred to his homosexuality when discussing what he considered his positive steps toward rehabilitation, including his coming to terms with being gay" and that it was not him, but rather the Parole Board members "who focused so much attention

on his sexual orientation." (*Id.* at ¶ 31). He also contends that Dottridge treated the fact that he had come to terms with his sexual orientation as a negative factor, and that by her statements Dottridge indicated that the fact that Wilborn is openly gay makes him less suitable for parole than other prisoners. (*Id.* at ¶¶ 32–33).

With respect to Walsh, the chairman of the Board, Wilborn alleges that he "made statements suggesting that Mr. Wilborn['s] homosexuality would be a permanent, hidden risk for future crimes, in contrast with a drug addiction." (*Id.* at ¶ 34). In particular, Wilborn challenges the following statement allegedly made by Walsh:

> [I]f you cure the drug addiction, you've cured the breaking and entering ... I am worried of [sic] whether you'd be able to be supervised out in the community by an average parole officer in the street because testing you for drugs or alcohol won't show that you're a risk to the community.

(*Id.* at ¶ 34). Wilborn alleges that this statement indicates that Walsh considered Wilborn's "sexual orientation itself as a permanent danger to society because it cannot be 'cured.'" (*Id.* at ¶ 35).

Wilborn also challenges the following statements allegedly made by Board member Merigan:

> the concern I would have is, that, once you're put back into the community, and ... you had a relationship, and the person says, '... we need money ... let's do just this one act ...' ... and you're the type of guy who would say, 'Well, you know what? I ... we'll do it just this one time....'

(*Id.* at ¶ 36). Wilborn claims that this statement shows that Merigan believed that Wilborn is more likely to recidivate "because he forms romantic relationships

with men" and, therefore, is a greater risk to society. (*Id.* at ¶ 37).

Finally, Wilborn summarized the hearing as follows:

> The Board's repeated antigay comments and questions impermissibly focused on Mr. Wilborn's sexuality rather than relevant considerations regarding his re-entry into society. They also created a threatening atmosphere at the Hearing, denying Mr. Wilborn a fair and meaningful opportunity to be heard.

(*Id.* at ¶ 38).

### *The Parole Board's Written Decision*

After the hearing, the Board issued a written decision in which it denied Wilborn parole. The vote was 5–1 vote, with the dissent concluding that "Subject has been very program involved. He has excellent community support. He is ready for parole. Release is compatible with the welfare of society." (Dec. at 2). The basis for the Board's majority decision was that it did not find Wilborn trustworthy. Wilborn contends, as detailed below, that the examples given by the Board of his untrustworthiness are factually unsupportable, and that these false reasons are further evidence that the Board acted based on its improper anti-gay sentiments. As the Board stated in its Decision:

> The Board ... will focus on the issues at hand. Whether Mr. Wilborn is a risk to the community if released and whether his release is incompatible with the welfare of society. The Board must weigh and assess whether Mr. Wilborn has, through introspection and programming, addressed the causative factors that resulted in the death of Mr. Weinstock. This is a somewhat unusual crime that occurred not because of an addiction to drugs or alcohol or due to an underlying mental health issue. Instead, the reasons that Mr. Wilborn engaged in a very

calculated and cold plan to murder Mr. Weinstock were monetary and also, according to him, due to his inability to cope with the fact that he is homosexual. Mr. Wilborn assures the Board that he has come to terms with his sexuality and that he is confident in the person that he has become.

> The Board has serious reservations about the release of Mr. Wilborn at this time due to one main factor: trust. Through his history, *both prior to the murder, the murder itself, and during his incarceration, Mr. Wilborn has engaged in extremely manipulative and deceptive behavior. Prior to the murder, for no apparent reason, he was found sneaking into a home in the neighborhood with a friend. At his hearing, he offered no credible explanation for his actions.* The murder itself involved elaborate plans and schemes to murder Mr. Weinstock. He and his co-defendant discussed many options to kill the victim, including poisoning. They eventually decided to write a personal ad that they believed the victim would respond to. It was under this pretense that they were able to isolate the victim in the parking lot and murder him. *His behavior continued inside the institution, where he readily admitted to placing contraband in other cells in order to force other inmates out of his living situation.*

> These are some examples of the type of behavior that Mr. Wilborn has engaged in that causes the Members of the Parole Board to question whether he can be trusted in the community. Parole involves a great deal of trust in the community that a person will live and act as a law-abiding citizen. *The Board is of the opinion that Mr. Wilborn will say or do anything in order to be released on parole supervision. His cred-*

*ibility, honesty, and ability to be trusted in the community are at the heart of this decision.*

(Dec. at 2) (emphasis added).

### Factual Disputes

Wilborn takes exception to the Parole Board's description of the two events (in addition to the murder itself) on which the Board relied in support of its conclusion that Wilborn has engaged in "extremely manipulative and deceptive behavior." (*Id.*; Compl. at ¶ 52). According to Wilborn, prior to his 1983 guilty plea Wilborn's criminal record was limited to a 1981 misdemeanor charge to which he pleaded guilty when he was an 18–year–old high school student. (Compl. at ¶ 56). This is the "sneaking into a home" incident on which the Board relied. Contrary to the Board's conclusion that Wilborn could offer "no credible explanation for his actions," Wilborn contends that he fully answered each of the questions posed by the Board and provided the Board "with as accurate [an] explanation as he could of the facts and circumstances surrounding the twenty-five year old charge." (*Id.* at ¶ 57). Wilborn contends that the Board's purported reliance on this event is a subterfuge, and he questions "why a 25–year–old misdemeanor was relevant in 2006 to the issue of 'trust'" and "what the 1981 incident had to do with Mr. Wilborn's rehabilitation or likelihood of recidivism in 2006." (*Id.* at ¶ 59).

The second allegedly misrepresented event was Wilborn's only major disciplinary infraction during his incarceration, which occurred in 1991. (*Id.* at ¶ 60). In its Decision, the Parole Board wrote that Wilborn's manipulative and deceptive behavior "continued inside the institution, where he readily admitted to placing contraband in other cells in order to force other inmates out of his living situation."

(Dec. at 2). Wilborn claims that he did not "readily admit" to this and that, in fact, his role in the incident was much more limited then suggested by the Decision. (Compl. at ¶¶ 60, 64). Specifically, Wilborn alleges:

> The infraction involved another inmate who was regularly victimized by a reputed "gay basher." This inmate attempted to have the "gay basher" removed from his unit by hiding a bag of powdered sugar in his harasser's cell to simulate contraband. Mr. Wilborn's involvement in the incident was limited to suggesting that the inmate take nonviolent action and typing an anonymous note alerting the guards to the presence of the contraband at the request of the harassed inmate.

(*Id.* at ¶ 60). Wilborn further alleges that his version of events is supported by the contemporaneous disciplinary reports, and there is no evidence that he placed contraband in another inmate's cell, much less that he readily admitted to it. (*Id.* at ¶¶ 62–65).

### Other Parole Decisions

Wilborn claims that he was denied parole despite the fact that similarly situated prisoners who were heterosexual were granted parole during the same time period. For example, but without limitation, Wilborn alleges that two prisoners serving life sentences for second degree murder were granted parole at or about the same time that Wilborn was denied parole, despite one having participated in a "racially-motivated prison fight" within the previous two years and the other having attacked another prisoner with a weapon causing serious injury within the previous three years. (*Id.* at ¶¶ 39–41). Wilborn further alleges that the Board has paroled many other prisoners who have more troubling disciplinary records, less evidence of rehabilitative or community participation, and lesser support systems available upon re-

lease. (*Id.* at ¶ 43). In sum, Wilborn contends that the defendants conducted his hearing "differently and considered different factors than they would have were Mr. Wilborn not openly gay. In impermissibly relying on Mr. Wilborn's sexual orientation in deciding to deny him parole, the Board treated Mr. Wilborn differently than similarly-situated prisoners." (*Id.* at ¶ 44).

Additional facts will be provided below where appropriate.

## III. *ANALYSIS*

### A. *Sovereign Immunity*

In Count III, Wilborn contends that the defendants denied him his right to equal protection of the laws as guaranteed by Article I of the Massachusetts Declaration of Rights in violation of Mass. Gen. Laws ch. 12, §§ 11H–I. (Compl. at ¶¶ 85–89). In Count IV, Wilborn contends that the defendants deprived him of the fair hearing to which he was entitled in violation of Mass. Gen. Laws ch. 12, §§ 11H–I, and his right to due process under Articles X and XII of the Massachusetts Declaration of Rights. (*Id.* at ¶¶ 91–93). Under both Counts, he is seeking a declaration that his parole hearing was unconstitutional as it was "tainted by discriminatory intimidation and coercion" and an injunction ordering the defendants "to immediately provide Mr. Wilborn with a parole hearing untainted by discriminatory threats, intimidation, and coercion." (*Id.* at ¶¶ 89, 93). The defendants have moved to dismiss these claims as barred by the Eleventh Amendment and the doctrine of sovereign immunity. This court agrees that the claims are barred and recommends that Counts III and IV be dismissed.

 By now, it is well established "that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984). Moreover, "this principle applies as well to state-law claims brought into federal court under pendent jurisdiction." *Id.* Wilborn does not dispute that his claim for "injunctive relief against state officials for violation of *state law*" is precluded by the Eleventh Amendment. *See Diaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 43 (1st Cir.2006); Opp. at 25. However, he argues that it is an open question whether suits for declaratory judgments are barred as well. Opp. at 25. This court disagrees and holds that declaratory relief is not available to Wilborn either.

As the *Pennhurst* court held, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911. A request for a declaration that "requires the federal court to make pronouncements on the lawfulness of the Commonwealth and its officials' conduct with respect to the Commonwealth's own law" is as intrusive of state sovereignty as an injunction mandating compliance with a state's own laws. *See Diaz–Fonseca,* 451 F.3d at 43 (declaratory judgment "plainly runs afoul of *Pennhurst*"), and cases cited. Wilborn's request for declaratory relief, therefore, does not save his state law claims. *See Tolman v. Finneran,* 171 F.Supp.2d 31, 38 (D.Mass.2001) (request for declaratory relief does not "save plaintiffs' state law claims" and is barred under *Pennhurst*), and cases cited.

For these reasons, this court recommends that Counts III and IV of the First Amended Complaint be dismissed.

### B. Due Process Claims—Constitutionally Protected Liberty Interests

 The defendants have moved to dismiss Wilborn's due process claims (Counts II and IV) on the grounds that he cannot establish a constitutionally protected interest in parole and, hence, he cannot assert a right to due process. *See Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir.2006) (to maintain a due process claim, plaintiff must establish "a protected interest in life, liberty, or property."). It is undisputed that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979). Moreover, while "a state may create a liberty interest where none inherently exists by enacting provisions governing parole that give an inmate a reasonable expectation that he will be released if certain specified criteria are met[,]" Massachusetts has not done so. *Lynch v. Hubbard*, 47 F.Supp.2d 125, 127–28 (D.Mass.1999), *aff'd*, 248 F.3d 1127, 2000 WL 1824490 (1st Cir.2000) (unpub. dec.). Nevertheless, the motion to dismiss on this basis must fail.[4] It has long been "clear that even though a prisoner has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a prisoner on a basis that infringes his constitutionally protected interests[.]" *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

 Based on these principles, courts have long held that federal anti-discrimination guarantees apply to parole decisions. *See Thompson v. Davis*, 295 F.3d 890, 897–98 (9th Cir.2002) (parole may not be denied on basis of disability protected by the ADA), and cases cited. *See also White v. Bond*, 720 F.2d 1002, 1003 (8th Cir.1983) (inmates "allegation of racial discrimination in the parole process appears to state a cognizable section 1983 claim"), and cases cited; *Bentley v. Tennis*, Civil No. 3:CV–06–2073, 2007 WL 4248258, at *3 (M.D.Pa. Nov. 30, 2007) ("Under substantive due process, a state may not deny parole on constitutionally impermissible grounds, such as race or in retaliation for exercising constitutional rights" or because of "factors bearing not rational relationship" to the state's interests). As detailed more fully below, Wilborn has alleged sufficient facts to state a claim that he has been discriminated against by the Parole Board based on his sexual orientation. He is entitled to assert that this conduct violated his due process rights even in the absence of a liberty interest in parole. Therefore, this court recommends that the motion to dismiss the due process claims due to a lack of a liberty interest in parole be denied.

### C. Sufficiency of Allegations

The defendants have also moved to dismiss all counts of the complaint on the grounds that the allegations fail to establish that parole was denied because of Wilborn's sexual orientation and/or because he has failed to allege that a majority of the Board acted with improper purpose. This court concludes that the pleadings are sufficient to survive a motion to dismiss.

---

**4.** As detailed above, this court recommends that Wilborn's due process claim based on state law (Count IV) be dismissed as barred by the Eleventh Amendment and doctrine of sovereign immunity.

### *"Majority" Action*

■ Addressing the latter argument first, defendants contend that Wilborn is only challenging statements made by three members of the Board, and since that is not a majority he cannot establish that the Board's decision, as opposed to the votes of the individual members of the Board, was based on an improper purpose. (Mem. at 17–18). Ultimately, Wilborn will have to establish either that a majority of the Board acted improperly or "(a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others." *Scott–Harris v. City of Fall River,* 134 F.3d 427, 438 (1st Cir.1997), *rev'd on other grounds sub nom. Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). *Accord Collins v. Nuzzo,* 244 F.3d 246, 251 (1st Cir.2001). However, the court concludes that "[a]t this early stage of the litigation, plaintiff's allegations concerning [three] members of the board are sufficient." *Rubin v. Town of Norton,* No. 00–11712–RWZ, 2001 U.S. Dist. LEXIS 13032, at *7 (D.Mass. July 16, 2001) (allegations of bias on the part of two out of seven members of a municipal planning board sufficient to survive motion to dismiss).

As an initial matter, in light of the fact that Wilborn has challenged statements made by three of the five board members who voted to deny him parole, it is not clear that he has not pleaded an improper motive on the part of a majority of the Board members. Assuming, arguendo, that he has not established an action by a majority of the Board, he has challenged the actions of a "significant bloc" of Board members, and has pled sufficient facts from which an inference of "complicity of others" can be drawn. Thus, not only, as discussed *infra,* does he challenge specific statements made by three members, he also alleges that the Parole Board conducted its hearing differently and that it based its decision on pretextual excuses and factual inaccuracies. These actions required participation by all of the Board members who voted to deny parole. Therefore, this court finds that the pleadings are sufficient at this stage to meet the requirement that the Board, as opposed to individuals, acted improperly.

### *Allegations of Bias*

In connection with their motion to dismiss, the defendants assume, without discussion, that if the Parole Board based its decision to deny parole on Wilborn's sexual orientation, the Board would have acted unconstitutionally.[5] Rather, the defendants argument is limited to their contention that the statements attributed to the three Board members are insufficient evidence that these members voted to deny Wilborn parole due to his sexual orientation. (*See* Mem. at 14–17). This argument must fail for several reasons. As an initial matter, the statements are ambiguous, especially when considered in the context described in the Complaint, and are subject to the interpretation attributed to them by Wilborn. Even more importantly, however, the defendants are ignoring the additional facts on which Wilborn relies in support of his discrimination claim. In particular, but without limitation, the defendants ignore Wilborn's claims of factual errors and distortions of his disciplin-

---

**5.** Thus, the defendants do not address the standard of review for a claim of discrimination based on sexual orientation, nor do they address the elements of the plaintiff's equal protection claim. Rather, their motion to dismiss is limited to their contention that "none of the comments Wilborn cites in his complaint are sufficient to demonstrate that any of the three Board members he quotes voted to deny parole based on Wilborn's sexual orientation." Mem. at 2. Consequently, this court will limit its analysis accordingly.

ary and criminal records, as well as his claim that he was treated differently than similarly situated heterosexual inmates. These facts as pled by Wilborn are sufficient to survive a motion to dismiss Wilborn's claims of discrimination.

With respect to the statements themselves, the defendants admit that defendant Dottridge's statements, which included several references to the fact that Wilborn is gay, may be considered ambiguous. (*See* Mem. at 16–17). Certainly, this court cannot find that her statements are insufficient to establish bias as a matter of law. Similarly, defendant Merigan seems to have focused on Wilborn's role in a relationship. Given the other statements made about Wilborn's sexuality, Merigan may have been commenting on Wilborn's role in a homosexual relationship and Merigan's perceptions of the "type of guy" who would enter into a homosexual relationship. (*See* Compl. ¶ 36). Defendant Walsh apparently was concerned about Wilborn's ability to be supervised in the community "by an average parole officer in the street," a concern which may have been based on Wilborn's homosexual lifestyle given the context in which the statements were allegedly made. In light of the liberal pleading requirements, at this stage this court is not prepared to discount Wilborn's contention that "[t]he Board's repeated antigay comments and questions impermissibly focused on Mr. Wilborn's sexuality rather than relevant considerations regarding his re-entry into society" without further development of the record. (Compl. ¶ 38).

The defendants also cannot ignore Wilborn's contentions that the Board misrepresented the facts of Wilborn's misdemeanor conviction as an 18 year old and his disciplinary record in prison. Significantly, Wilborn contends that the Board's description of the prison event is refuted by the contemporaneous disciplinary records and, thus, proof of the Board's error should have been readily available. Since these events were critical to the Board's conclusion that Wilborn was untruthful and manipulative, errors in the Board's description of these events cannot be ignored. Reliance on knowingly false information may be evidence of an attempt to cover-up a discriminatory intent. In addition, "the use of false information in a parole violation can be a due process violation" in and of itself. *Jones v. Ray,* 279 F.3d 944, 946 (11th Cir.2001) (citing *Monroe v. Thigpen,* 932 F.2d 1437, 1442 (11th Cir.1991)). *See also Johnson v. Runnels,* No. CIV S–03–2496 RRB KJMP, 2007 WL 2795005, at *4 (E.D.Cal. Sept. 25, 2007), and cases cited. Thus, these allegations cannot be ignored in assessing the sufficiency of the complaint.

█ Without belaboring the point, the defendants also improperly ignore the allegations, supported by specific examples, that Wilborn was denied parole while other similarly situated heterosexual prisoners were granted parole. "A plausible equal protection violation is established when a plaintiff shows by his or her well-pleaded facts that [he] was treated differently from 'others similarly situated ... based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Clark v. Boscher,* 514 F.3d 107, 114 (1st Cir.2008) (quoting *Aponte–Torres v. Univ. of P.R.,* 445 F.3d 50, 57 (1st Cir. 2006)). "Two persons or entities are similarly situated if 'a prudent person, looking objectively at the incidents (complained of), would think them roughly equivalent and the protagonists similarly situated ... 'in all relevant respects.'" *Id.* at 114 (quoting *Barrington Cove v. R.I. Hous. &*

*Mortg. Fin. Corp.,* 246 F.3d 1, 8 (1st Cir. 2001)). As a general rule, "the ultimate determination as to whether parties are similarly situated is a fact-bound inquiry and, as such, is normally grist for the jury's mill." *Cordi–Allen v. Conlon,* 494 F.3d 245, 251 (1st Cir.2007). Thus, it would be premature to rule at this stage that the other prisoners granted parole at or around the time of Wilborn's denial were not similarly situated to him. If heterosexual, similarly situated prisoners were granted parole while Wilborn was not, this would be additional evidence that the defendants improperly relied on Wilborn's sexual orientation in denying him parole.

In sum, when considering the allegations of the Complaint as a whole, this court finds that Wilborn has alleged sufficient facts to state a claim that the Board denied him parole because of his sexual orientation.

## IV. *CONCLUSION*

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Defendant's Motion to Dismiss (Docket No. 21) be ALLOWED IN PART and DENIED IN PART. Wilborn's state law claims (Counts III and IV) should be dismissed,

---

6. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

while he should be allowed to proceed with his federal claims (Counts I and II).[6]

August 6, 2008.

*Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–05 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).